797 F.2d 1027
 122 L.R.R.M. (BNA) 3265, 254 U.S.App.D.C.
360, 55 USLW 2139,
104 Lab.Cas. P 11,900
 LOCAL UNION 1395, INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Indianapolis Power & Light Company, Intervenor.
 No. 85-1164.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 10, 1986.
Decided Aug. 8, 1986.
 
 Robert D. Kurnick, with whom Laurence J. Cohen, Washington, D.C., D. William Heine, Jr., Los Angeles, Cal., Edward J. Fillenwarth, Jr., Indianapolis, Ind., and Marsha S. Berzon, Washington, D.C., were on brief, for petitioner.
 Patrick J. Szymanski, Atty., with whom Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, and Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., were on brief, for respondent.
 Herbert C. Snyder, Jr., with whom Alan K. Mills, Indianapolis, Ind., was on brief, for intervenor, Indianapolis Power & Light Co.
 Before STARR and SILBERMAN, Circuit Judges, and WRIGHT, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Local Union 1395, International Brotherhood of Electrical Workers, AFL-CIO, petitions for review of an order of the National Labor Relations Board dismissing an unfair labor practice complaint. The complaint charged that the Indianapolis Power & Light Company violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1), (3) (1982), by suspending an employee who had refused to cross a picket line in the course of his duties. The Board held that the employee's right to engage in this "sympathy strike"[1] had been waived in Local 1395's collective bargaining agreement with Indianapolis Power, which contained a no-strike clause. Because the Board failed to address relevant evidence of the parties' intent underlying this no-strike clause, however, we reverse the Board's decision and remand the case to the Board for further consideration.
 
 I.
 
 2
 Since 1972, Local 1395 and Indianapolis Power have entered into a series of collective bargaining agreements. Each of these agreements has contained a clause providing:
 
 
 3
 During the term of this agreement, and any extension or renewal thereof, the Union and each employee covered by the agreement agree not to cause, encourage, permit, or take part in any strike, picketing, sit-down, stay-in, slow-down, or other curtailment of work or interference with the operation of the Company's business, and the Company agrees not to engage in a lock-out.
 
 
 4
 In August 1983, employee Herbert King was assigned to read the meters on the premises of one of Indianapolis Power's customers. Arriving on the scene, however, King encountered a picket line set up by workers on strike against the company. King refused to cross the picket line despite his supervisors' instructions to do so. As a result, King was threatened with termination and suspended from work for two-and-one-half days. In response, Local 1395 filed an unfair labor practice charge, and, subsequently, the NLRB's General Counsel issued a complaint alleging that the discipline imposed upon King violated Sections 8(a)(1) and 8(a)(3) of the Act.
 
 
 5
 After a hearing, an administrative law judge issued a decision sustaining the complaint. The ALJ noted that the Board, in Operating Engineers Local 18 (Davis-McKee, Inc. ), 238 N.L.R.B. 652 (1978), had held that "broad no-strike clauses, without more, are insufficient to establish waiver of the right to engage in sympathy strikes." Id. at 654. Accordingly, the ALJ concluded that the collective bargaining agreement's no-strike clause would not effectively waive the right to honor picket lines unless extrinsic evidence of the parties' specific intent (such as bargaining history and past practice under the agreement) conclusively established such a waiver. The ALJ regarded the evidence on this point as equivocal at best; he found that the parties had expressed different views at the bargaining table over whether the no-strike clause covered sympathy strikes and had, in effect, agreed to disagree on the issue. Thus, the ALJ held, the right had not been waived, King's refusal to cross the picket line was protected conduct, and Indianapolis Power's sanctions against him ran afoul of the Act.
 
 
 6
 On January 31, 1985, the Board issued a decision reversing the ALJ. Rejecting the basic approach announced in Davis-McKee, the Board maintained that it could "discern no logical or practical basis for the proposition that the prohibition of all 'strikes' does not include sympathy strikes merely because the word 'sympathy' is not used." 273 N.L.R.B. No. 211, 1984-85 NLRB Dec. (CCH) p 17,040 (1985) slip op. at 2-3. A broadly-phrased no-strike clause, according to the Board, should properly be read to encompass sympathy strikes unless the contract as a whole or extrinsic evidence demonstrates that the parties intended otherwise. See id. The Board stated generally that it agreed with the ALJ that the extrinsic evidence of the parties' intent was uncertain and inconclusive; but the Board did not discuss the ALJ's specific finding that the parties had expressed different meanings about the scope of the no-strike clause at the time they entered the agreement. Instead, the Board regarded the no-strike clause's plain meaning as dispositive. The Board held that employees had waived their right to honor picket lines, and so concluded that Indianapolis Power was entitled to discipline King for refusing to carry out his work assignments.
 
 
 7
 Local 1395 filed this petition for review. This court has jurisdiction pursuant to Section 10(f) of the Act, 29 U.S.C. Sec. 160(f) (1982).
 
 II.
 A.
 
 8
 We begin with settled principles. Under Section 7 of the Act, 29 U.S.C. Sec. 157 (1982), employees enjoy the right to observe lawful picket lines that they encounter in the course of their duties. See, e.g., United States Steel Corp. v. NLRB, 711 F.2d 772, 775-76 (7th Cir.1983); NLRB v. Southern Cal. Edison Co., 646 F.2d 1352, 1363-64 (9th Cir.1981). This right, however, may be waived by employees in collective bargaining agreements. See NLRB v. Rockaway News Supply Co., 345 U.S. 71, 79-80, 73 S.Ct. 519, 524-25, 97 L.Ed. 832 (1953); News Union of Baltimore v. NLRB, 393 F.2d 673, 677 (D.C.Cir.1968). Still, waiver of the right to engage in sympathy strikes, like waiver of other rights under the Act, must be "clear and unmistakable." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); IBEW Local 1466 v. NLRB, 795 F.2d 150, 153 (D.C.Cir.1986).
 
 
 9
 In this proceeding, the Board altered its basic approach toward analyzing collective bargaining agreements for a waiver of the right to honor picket lines. Under Davis-McKee, the Board apparently would find such a waiver only if a contractual no-strike provision specifically referred to sympathy strikes or if extrinsic evidence unambiguously established that the parties intended such a waiver. Now the Board regards a broadly-phrased, comprehensive no-strike clause as sufficiently "clear and unmistakable" evidence that employees intended to waive the right to engage in sympathy strikes, unless the contract as a whole or extrinsic evidence demonstrates the contrary.
 
 
 10
 In reviewing the Board's orders, courts customarily defer to the Board's exercise of its "special function of applying the general provisions of the Act to the complexities of industrial life." NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). This deference is not withheld simply because the Board has departed from a prior policy. See NLRB v. Local Union 103, Iron Workers, 434 U.S. 335, 350-51, 98 S.Ct. 651, 660-61, 54 L.Ed.2d 586 (1978). However, while it is settled that the Board may interpret collective bargaining agreements when they are raised as defenses in unfair labor practice proceedings, see NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), it is less clear whether such interpretations are entitled to judicial deference. Compare, e.g., NLRB v. Southern Cal. Edison Co., 646 F.2d 1352, 1362 (9th Cir.1981) (deference is appropriate), with Pacemaker Yacht Co. v. NLRB, 663 F.2d 455, 458 (3d Cir.1981) (deference is inappropriate).[2] The approach reflected in cases of this Circuit appears to be that deference is extended to the Board's factual findings on matters bearing on the intent of the parties, see News Union of Baltimore v. NLRB, 393 F.2d 673, 677-78 (D.C.Cir.1968), but not to the ultimate legal conclusion attached to the parties' words and conduct. See Retail Clerks Int'l Ass'n Local 455 v. NLRB, 510 F.2d 802, 805 (D.C.Cir.1975).
 
 
 11
 The reason for this approach is not simply that contract interpretation simpliciter has traditionally been thought to be peculiarly within the expertise of the judiciary. Courts have often found it appropriate to give weight to the interpretation of regulated parties' agreements by an administrative agency charged with the primary enforcement of a statutory mandate. See, e.g., Kansas Cities v. FERC, 723 F.2d 82 (D.C.Cir.1983). The added factor here is that the courts' role under the labor laws goes beyond merely seeing that the Board stays within the bounds of its delegated authority. Congress has authorized the courts independently to entertain suits brought to enforce collective bargaining agreements under Section 301 of the Labor-Management Relations Act, 29 U.S.C. Sec. 185 (1982), and has directed them to formulate the principles of federal contract law to be applied in these suits. See Textile Workers v. Lincoln Mills, 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957).
 
 
 12
 If deference were afforded the Board's interpretation of collective bargaining agreements, the Board would be free to apply different (if sufficiently reasonable) standards of interpretation than those applied by the courts in Section 301 suits. That result would surely undermine the voluntary collective bargaining process that lies at the heart of federal labor policy. As the Supreme Court stated in Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) (in the context of holding state contract law preempted by Section 301):
 
 
 13
 The possibility that individual contract terms might have different meanings [in different forums] would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to interpretation.
 
 
 14
 369 U.S. at 103-04, 82 S.Ct. at 576-77 (footnote omitted). See also Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 1910-11, 85 L.Ed.2d 206 (1985). We find in these concerns powerful reasons to adhere to the view expressed by former Chief Judge Bazelon in Retail Clerks that the Board's interpretation of contractual provisions is entitled to "no particular deference." 510 F.2d at 805.
 
 B.
 
 15
 Before turning to the particular contract before us, we address the question--vigorously disputed by the parties--of how the standard governing the waiver of statutory rights ought to be applied. Local 1395 maintains that the Board's new approach, which treats waiver of sympathy strikes essentially as a matter of straightforward contract interpretation, is inconsistent with the "clear and unmistakable" standard. According to Local 1395, this standard is addressed to an employee's subjective intention to give up a statutory right, rather than to an objectively reasonable construction of a contract that binds the employee. The petitioner contends that the clear and unmistakable test represents a more exacting standard than that employed by courts in suits brought under Section 301 to enforce collective bargaining agreements (or, for that matter, by arbitrators). Under this view, while a court or arbitrator would not be precluded, under "accepted principles of traditional contract law," Lucas Flour, 369 U.S. at 105, 82 S.Ct. at 578, from reading a general no-strike clause to cover sympathy strikes, the Board could not find a waiver of the right to honor picket lines without more specific contractual language or compelling extrinsic evidence.
 
 
 16
 Local 1395's argument, ably presented by counsel, is not without intuitive appeal. At first blush, one might well think that finding a "clear and unmistakable waiver" of a statutory right requires more elaborate evidentiary support than simply placing an objective construction on a contract. But that is not in fact the approach adopted by the Supreme Court. In NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), which held that a general no-strike clause waived employees' right to engage in sympathy strikes, the Supreme Court stated that resolution of the case required "no determination of rights or duties respecting picket lines broader than this contract itself prescribes." Id. at 79, 73 S.Ct. at 524. Similarly, in Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), upon which the petitioner principally relies, the Court stated that the question of waiver "turns upon the proper interpretation of the particular contract before us." Id. at 279, 76 S.Ct. at 356. The relevant cases simply do not support the proposition that waiver hinges upon employees' subjective intent rather than the mutual consent reflected in a contractual commitment.
 
 
 17
 Local 1395 relies upon cases such as Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), which discuss the requirements governing the waiver of constitutional rights. The distinction between those cases and the present one, we think, is that waiver of constitutional rights is disfavored. By contrast, no federal policy is disserved when a union is permitted freely to enter into agreements limiting its recourse to economic weapons in exchange for "gains it considers of more value to its members." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 707, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). In our view, federal labor policy is more threatened by the interposition of artificial rules of construction upon the parties' mutual intent when "waiver" of sympathy strikes is at stake than by the Board's practice of giving effect to the clear import of contractual language. See generally Note, Coterminous Interpretation: Limiting the Express No-Strike Clause, 67 VA.L.REV. 729, 742-45 (1981). A grudging or stilted interpretation of collective bargaining agreements tends to encroach upon the fundamental national policy favoring the ordering of the employer-employee relationship by voluntary bargaining rather than governmental fiat, cf. H.K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970);[3] it injects into the collective bargaining process an uncertainty that diminishes the prospects for successful bargaining. See United States Steel Corp. v. NLRB, 711 F.2d 772, 780 (7th Cir.1983); Pacemaker Yacht Co. v. NLRB, 663 F.2d 455, 460 (3d Cir.1981).[4]
 
 
 18
 For the same reason we reject the petitioner's contention that the standards governing the question of waiver in unfair labor practice proceedings before the Board differ markedly from the contract interpretation practiced by courts under Section 301. Precedents from these two forums regarding interpretation of collective bargaining agreements have typically been cited interchangeably. Courts deciding cases arising under Section 301 have relied upon Board decisions about waiver of the right to strike, e.g., Lucas Flour, 369 U.S. at 105, 82 S.Ct. at 577, and have applied the "clear and unmistakable" standard, e.g., Ryder Truck Lines, Inc. v. Teamsters Local 480, 727 F.2d 594, 600 (6th Cir.) (en banc), cert. denied, 469 U.S. 825, 105 S.Ct. 103, 83 L.Ed.2d 48 (1984); Delaware Coca-Cola Bottling Co. v. Teamsters Local 326, 624 F.2d 1182, 1184 (3d Cir.1980); cf. Drake Bakeries v. Local 50, American Bakery & Confectionary Workers Int'l, 370 U.S. 254, 265, 82 S.Ct. 1346, 1352, 8 L.Ed.2d 474 (1962) (citing Mastro Plastics ); conversely, courts reviewing decisions of the Board regarding waiver have discussed the reasoning of Section 301 cases, e.g., NLRB v. Magnavox Co., 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974); Metropolitan Edison, 460 U.S. at 708 n. 12, 103 S.Ct. at 1477 n. 12; cf. Rockaway News, 345 U.S. at 80, 73 S.Ct. at 524 (deferring to arbitrators' interpretation of collective bargaining agreement's no-strike clause). Indeed, in formulating its prior approach toward no-strike clauses in Davis-McKee, the Board explicitly relied upon its reading of the Supreme Court's Section 301 decisions. See 238 N.L.R.B. at 654.
 
 
 19
 Although this process of cross-fertilization has taken place largely without analysis or conscious approval, we think it follows quite naturally from the policies of the labor laws. A divergence of interpretive standards "would inevitably exert a disruptive influence" on the voluntary collective bargaining process central to federal labor policy. Lucas Flour, 369 U.S. at 103, 82 S.Ct. at 576. As the Supreme Court has instructed, a uniform approach to the interpretation of labor agreements is necessary to a healthy system of voluntary collective bargaining. See supra pp. 1030-1031. The petitioner concedes that under its view, an employer could obtain an award of damages in a Section 301 suit against a union on the theory that a sympathy strike violated a no-strike clause, but the employer would be guilty of unfair labor practices if it disciplined employees for the same conduct. This is precisely the sort of "conflicting substantive interpretation under competing legal systems" that the Court has regarded as destructive of the collective bargaining process. Lucas Flour, 369 U.S. at 104, 82 S.Ct. at 577. We cannot accept the view that Congress sanctioned such an anomalous result.
 
 
 20
 We conclude, then, that the standards governing the question of whether a contract "waives" statutory rights (and thereby provides a defense to an unfair labor practice charge) do not differ significantly from those applied in breach-of-contract suits under Section 301. In neither context, however, is it appropriate to interpret collective bargaining agreements in a vacuum, solely in accordance with "abstract definitions unrelated to the context in which the parties bargained and the basic regulatory scheme underlying that context." C & C Plywood, 385 U.S. at 430, 87 S.Ct. at 565. Rather, collective bargaining agreements must be read in light of the realities of labor relations and considerations of federal labor policy, see Lucas Flour, 369 U.S. at 105, 82 S.Ct. at 577, which make up the background against which such agreements are entered. See Mastro Plastics, 350 U.S. at 279-83, 76 S.Ct. at 356-58. To be sure, the clear and unmistakable test dictates that the waiver of statutory rights may not be inferred casually. But that test also cannot be applied woodenly; whether rights have been waived with the requisite clarity depends crucially upon context and "the specific circumstances of each case." Metropolitan Edison, 460 U.S. at 709, 103 S.Ct. at 1478.
 
 
 21
 Examination of the leading cases reveals that the explicitness with which a waiver must be stated in a contract varies with the nature of the right at issue. At one end of the spectrum lies Mastro Plastics. In that case, the Supreme Court held that a general no-strike clause did not waive employees' right to strike against flagrant unfair labor practices. The employees had struck to protest a campaign of intimidation by their employer designed to oust their incumbent representative, conduct "destructive of the foundation on which collective bargaining must rest." 350 U.S. at 281, 76 S.Ct. at 357. It seems highly unlikely, to say the least, that a union would agree to give up its members' right to strike against such conduct--in effect, to forfeit its means of self-preservation--and the Court held that a general no-strike clause did not by itself establish that concession. By contrast, in Lucas Flour, the Court unhesitatingly implied an obligation not to strike over arbitrable grievances from a collective bargaining agreement's arbitration clause. See 369 U.S. at 104-06, 82 S.Ct. at 577-78. Despite the absence of an express no-strike clause, the Court deemed it reasonable to presume that the union gave up the right to strike over arbitrable disputes in exchange for the employer's promise to submit such disputes to arbitration. See id. at 104-05, 82 S.Ct. at 577-78; see also Gateway Coal Co. v. UMW, 414 U.S. 368, 381-82, 94 S.Ct. 629, 638-39, 38 L.Ed.2d 583 (1974). Thus, where strikes over purely "economic" matters are at stake and the context strongly suggest that waiver was intended, "there does not have to be an express waiver." Metropolitan Edison, 460 U.S. at 708 n. 12, 103 S.Ct. at 1477 n. 12.
 
 
 22
 Somewhere between these two polar examples, we think, lies the question of waiver of the right to honor picket lines. Essentially, sympathy strikes are a type of economic weapon available to employees; because union members expect that the refusal to cross picket lines will be reciprocal, the practice rests on employees' self-interest as well as "sympathy." See Southern Cal. Edison, 646 F.2d at 1363-64, and cases cited therein. Still, we also recognize the right to honor picket lines is one that many union members cherish and, indeed, regard as fundamental to the union movement. For that reason, it might be thought that collective bargaining representatives would not lightly give up such a right. In assessing whether a broadly-phrased no-strike clause covers sympathy strikes, however, the unexpressed reservations of employees cannot be treated as dispositive; since a union's surrender of the right is not disfavored by reason of national labor policy (as, for instance, in Mastro Plastics), a court's task is simply to interpret the parties' manifestations of mutual consent. And in determining the meaning to be ascribed to a general no-strike clause, our starting point must be Rockaway News. In that case, the Supreme Court held a sympathy strike to be within the purview of a general no-strike clause. The Court's conclusion appears to have rested primarily on the language of the clause itself. See 345 U.S. at 79-80, 73 S.Ct. at 524-25.[5] Rockaway News thus establishes, at a minimum, that nothing in the Act prevents the Board or a court from finding a waiver of the right to honor picket lines in a contractual no-strike clause of sufficient breadth.
 
 
 23
 To counter the weight of Rockaway News, the petitioner relies upon cases in which it is stated that a union's no-strike obligation constitutes the quid pro quo for an employer's agreement to arbitrate specified disputes. See, e.g., Lincoln Mills, 353 U.S. at 455, 77 S.Ct. at 917. A general no-strike clause, Local 1395 contends, is ordinarily intended to cover only strikes over arbitrable grievances, and because sympathy strikes do not result from any immediate (and arbitrable) dispute between employer and employee, but rather from an employee's respect for a "stranger" picket line, such strikes are not covered by a general no-strike clause. We think, however, that the petitioner's argument proceeds from an overbroad premise. In a case like Lucas Flour, in which a no-strike obligation is implied, it is certainly reasonable to presume that the no-strike obligation is no broader than the duty to arbitrate from which it is inferred. However, this common-sense notion offers less guidance in interpreting an express no-strike clause. See United States Steel, 711 F.2d at 776-77; Delaware Coca-Cola Bottling, 624 F.2d at 1192 (Rosenn, J., concurring). In some situations, it will be apparent from the language and structure of an agreement that its no-strike and arbitration clauses are functionally linked. See, e.g., Gary Hobart Water Corp. v. NLRB, 511 F.2d 284 (7th Cir.), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). In other contexts, the inclusion of an express no-strike clause may evidence the parties' intent to reach beyond strikes over arbitrable matters (which would be banned by implication from an arbitration clause even absent an express no-strike clause). A no-strike clause may well constitute the quid pro quo, not merely for the promise to arbitrate disputes, but for the promise not to engage in lock-outs or for other concessions by the employer. The question "[u]ltimately ... depends on the intent of the contracting parties." Gateway Coal, 414 U.S. at 382, 94 S.Ct. at 639. And in discerning the intent of the parties underlying an express no-strike clause, Rockaway News is directly on point and Lucas Flour is not.[6]
 
 C.
 
 24
 The question remains whether this no-strike clause effectively waives the right to honor picket lines. From the language of the clause itself, we would be inclined to conclude that it does. The clause has extraordinary breadth: in the style of the draftsman determined to allow no loopholes, it refers to "any strike, picketing, sit-down, stay-in, slow-down, or other curtailment of work or interference with the operation of the Company's business." Significantly, too, the clause binds "the Union and each employee covered by the agreement," (emphasis added)--which precludes any argument that only union-authorized strikes are covered. Fairly read, then, the clause would seem to embrace the scenario of an employee's refusal to cross a picket line to discharge work assignments even though it does not specifically use the words "sympathy strike." See W-I Canteen Serv. v. NLRB, 606 F.2d 738, 745 (7th Cir.1979). The no-strike clause, moreover, is contained in a section of the agreement separate from the arbitration clause and appears to be fully independent of that clause; one cannot readily infer that the no-strike clause covers only arbitrable disputes. See United States Steel, 711 F.2d at 778. Finally, other provisions of the agreement strongly evidence the employees' commitment to facilitate the delivery of the uninterrupted service expected of a public utility.[7] This commitment is hardly consistent with a privilege to refrain from reading meters or performing other services on the premises of Indianapolis Power's customers because of the presence of picket lines on the site.
 
 
 25
 Local 1395 contends that because a collective bargaining agreement must be read "in the light of the law relating to it when made," Mastro Plastics, 350 U.S. at 279, 76 S.Ct. at 356, it is entitled to the benefit of the Board's prior Davis-McKee approach toward interpreting no-strike clauses. This contention is misplaced for several reasons. To begin with, when the no-strike clause was drafted in 1972, the Board was quite willing to find a waiver of the right to honor picket lines in a general no-strike clause. See, e.g., Local 12419, UMW (Nat'l Grinding Wheel Co.), 176 N.L.R.B. 628 (1969). In effect, then, the petitioner's argument rests on the hypothesis that the parties, in later ratifying preexisting contractual language without change, necessarily intended to incorporate changes in the law sub silentio. Even if it were appropriate to indulge such speculation, however, we note that Davis-McKee was not "the law" in the Seventh Circuit, where the agreement was entered and ratified. See W-I Canteen Serv. v. NLRB, 606 F.2d 738 (7th Cir.1979) (rejecting Davis-McKee approach). In any event, it is simply wrong to assume that "the law" to which parties refer in entering collective bargaining agreements is exclusively, or even primarily, Board law. As we have noted, see supra pp. 1030-1033, collective bargaining agreements are interpreted by arbitrators and courts as well.[8] Moreover, it is our distinct impression that the Board's Davis-McKee decision represents something of a sport among the corpus of the law of collective bargaining agreements viewed as a whole. We therefore reject Local 1395's suggestion that although it agreed to an undoubtedly broad no-strike clause, it could nonetheless rest assured (in reliance upon Davis-McKee) that that clause would not be interpreted as covering sympathy strikes.
 
 
 26
 Were we faced only with the language of the agreement itself, we would have little trouble upholding the Board's order. But the words parties use in drafting contracts are only evidence of their intent; the words are not themselves the parties' intent. The Board may not, in the guise of enforcing the "plain meaning" of contractual language, erect an inflexible presumption on an issue turning on the parties' actual intent. Cf. Scenic Artists Local 829 v. NLRB, 762 F.2d 1027 (D.C.Cir.1985). The intent of the parties to collective bargaining agreements is not to be discerned by reference to "abstract definitions unrelated to the context in which the parties bargained," C & C Plywood, 385 U.S. at 430, 87 S.Ct. at 565, especially where bargaining history is crucial to an understanding of that intent.[9] In the proceeding below, Local 1395 introduced evidence that when the contract was negotiated the parties had asserted different interpretations of the no-strike clause and that neither party had acquiesced in the other's view. The ALJ concluded that the parties had agreed to disagree over whether sympathy strikes were covered by the clause. If accepted, this factual finding would be controlling: absent mutual consent on the issue, there could be no binding contractual commitment, see RESTATEMENT (SECOND) OF CONTRACTS Secs. 20, 201 (1979), and, a fortiori, no clear and unmistakable waiver of the right to honor picket lines. See George Banta Co. v. NLRB, 686 F.2d 10, 20 (D.C.Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983).
 
 
 27
 While stating generally that it agreed with the ALJ's conclusions respecting the extrinsic evidence of the parties' intent, the Board did not address this specific finding. Instead, the Board stated only that "there is insufficient extrinsic evidence establishing the parties' intent to exclude sympathy strikes from the no-strike provision's scope." 273 N.L.R.B. No. 211, slip op. at 3. This assertion unfortunately assumes the very point at issue, i.e., whether sympathy strikes fall within the clause's scope. And in this regard, the Board's opinion fails to discuss relevant and perhaps dispositive evidence of the parties' intent. The Board appears to have failed to do what its opinion acknowledges it must do in interpreting a no-strike clause: "give the parties' intent controlling weight," id., whether that intent is established by the language of the clause itself, by inferences drawn from the contract as a whole, or by extrinsic evidence. See IBEW, Local 387 v. NLRB, 788 F.2d 1412, 1414 (9th Cir.1986).
 
 
 28
 It may be that the Board simply disagreed with the ALJ's finding that the parties had expressed different interpretations to each other at the time the contract was entered. There was conflicting evidence in the record on this point, as well as other evidence suggesting that union officials believed that sympathy strikes were covered by the clause.[10] The agency remained free to substitute its own view of the evidence for that of the ALJ, see Reckitt & Colman, Ltd. v. Administrator, DEA, 788 F.2d 22, 26 (D.C.Cir.1986), and cases cited therein; and this court must respect the Board's findings of fact if supported by substantial evidence. See 29 U.S.C. Sec. 160(f) (1982). What we may not do, however, is to presume that the Board made findings of fact necessary to a defensible decision. Cf. SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The Board's order under review does not explain or even recognize any departure from the ALJ's view of the evidence. Under these circumstances, we must reverse the Board's decision and remand the case to the Board for further proceedings. Accordingly, the petition for review is
 
 
 29
 granted.
 
 
 
 [1]
 The parties to this case, as well as the courts that have considered the issue, use the term "sympathy strike" to refer to employees' refusal (whether acting in concert or, as in this case, individually) to cross picket lines at the premises of their employer's customers
 
 
 [2]
 In Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the Supreme Court did not exhibit deference to the Board's view about whether a collective bargaining agreement waived a statutory right. On the other hand, the Court did not squarely address the question
 
 
 [3]
 To be sure, the policy favoring contractual autonomy does not govern all situations, and some statutory rights cannot be waived by contract. See, e.g., NLRB v. Magnavox Co., 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974) (right to solicit support for or against collective bargaining representative is non-waivable). Thus, while "a union may bargain away its members' economic rights, ... it may not surrender rights that impair the employees' choice of their bargaining representative." Metropolitan Edison, 460 U.S. at 705-06, 103 S.Ct. at 1475-76. It cannot seriously be argued that the right to engage in sympathy strikes falls in the latter category
 
 
 [4]
 In passing the Labor-Management Relations Act, Congress recognized that "[t]he chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation for the term of the agreement" and that absent this expectation, "there is little reason why an employer would desire to sign such a contract." S.Rep. No. 105, 80th Cong., 1st Sess. 16 (1947)
 
 
 [5]
 The Court went on to state that "if [the clause's language] be considered ambiguous in meaning," the conclusion that it covered sympathy strikes was buttressed by an arbitration decision to that effect. 345 U.S. at 79-80, 73 S.Ct. at 524-25. The Court also noted that the employer had tendered an offer of proof that in the course of negotiations the union had unsuccessfully sought an amendment excluding sympathy strikes from the no-strike clause. But the Court does not appear to have relied upon this extrinsic evidence because it was "not clear" whether the offer of proof had been accepted by the trial examiner. See id
 
 
 [6]
 We also regard as inapposite Buffalo Forge Co. v. United Steel Workers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), which held that courts may not enjoin a sympathy strike pending an arbitrator's decision as to whether the strike violates a contractual no-strike clause. Buffalo Forge simply addressed the scope of the Norris-LaGuardia Act's restrictions on injunctive relief; the Court expressly declined to decide whether sympathy strikes violated the no-strike clause in question. See id. 428 U.S. at 410, 96 S.Ct. at 3148
 
 
 [7]
 Section 1.04 of the agreement, entitled "Recognition of the Duties of Employees," states:
 (a) In recognition of the fact that the Company is a public utility which is obligated to provide continuous and adequate service to the public, each employee covered by this agreement has a special duty to assist the Company in maintaining that service by rendering competent, efficient and diligent service at all times in the performance of his job.
 (b) In the event of any interruption or threatened interruption of the service supplied or to be supplied by the Company to the public, the Union and each employee covered by this agreement hereby promise to assist the Company in preventing the interruption and in restoring, maintaining and continuing normal service to the public.
 
 
 [8]
 In fact, it is usually said that parties to collective bargaining agreements bargain for the arbitrator's interpretation of the agreement. See, e.g., United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). Accordingly, courts must give broad--indeed virtually complete--deference to an arbitrator's interpretation of a collective bargaining agreement. This is so because the arbitrator's interpretation is an integral part of the agreement itself, in a way that a public tribunal's interpretation could never be. This case, however, does not raise the question of whether the Board may defer to an arbitrator's interpretation of a contractual no-strike clause. See, e.g., Chevron, U.S.A., Inc., 275 N.L.R.B. No. 132, 1985-86 NLRB Dec. (CCH) p 17,374 (1985)
 
 
 [9]
 Besides being ill-suited for the interpretation of collective bargaining agreements, the so-called "plain meaning" rule has fallen from favor in the realm of general contract law. While it may be presumed that parties use words in their ordinary sense, this "presumption" does not govern where the parties' mutual intent to the contrary is demonstrated. See RESTATEMENT (SECOND) OF CONTRACTS Sec. 202(3)(a) (1979). A court may properly consider extrinsic evidence of the parties' intent even where the contractual language may seem unambiguous. See generally 3 CORBIN ON CONTRACTS Sec. 535-36 (1960)
 
 
 [10]
 In 1973, and again in 1975, Local 1395 sought to amend the clause specifically to permit employees to refuse to cross picket lines, but Indianapolis Power rejected these proposals. This bargaining history could well be thought to provide probative evidence that sympathy strikes were covered by the no-strike clause ab initio. See News Union of Baltimore, 393 F.2d at 677 n. 6; cf. Rockaway News, 345 U.S. at 79-80, 73 S.Ct. at 524-25 (dictum)