

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-14-2006

# Engelhard Corp v. NLRB

Precedential or Non-Precedential: Precedential

Docket No. 04-3034

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Engelhard Corp v. NLRB" (2006). *2006 Decisions*. Paper 1508.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1508

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 04-3034 & 04-4366

ENGELHARD CORPORATION,
Petitioner/Cross Respondent

*LOCAL 1430, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS,
AFL-CIO
Intervener-Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross Petitioner

(*Amended in Accordance with Clerk's Order dated 8/30/04)

Petition for Review and Cross-Application
For Enforcement of an Order of
The National Labor Relations Board
(No. 02-ca-32909; 02-ca-33080)

Argued September 29, 2005

Before: ALITO[*] and AMBRO, <u>Circuit Judges</u>,
RESTANI,[**] <u>Judge</u>

(Opinion filed: February 14, 2006)

Richard M. Escoffery, Esquire
Stanford G. Wilson, Esquire
Douglas H. Duerr, Esquire (Argued)
Elarbee, Thompson, Sapp & Wilson
229 Peachtree Street, N.E.
800 International Tower
Atlanta, GA   30303

      Counsel for Petitioner/Cross Respondent

James B. Coppess, Esquire (Argued)
815 16th Street, N.W.
Washington, D.C.   20006

Robert D. Kurnick, Esquire
Sherman, Dunn, Cohen, Leifer & Yellig
1125 Fifteenth Street, N.W.
Washington, D.C.   20005

---

[*]Then Judge, now Justice, Alito heard oral argument in this case but was elevated to the United States Supreme Court on January 31, 2006.  The opinion is filed by a quorum of the panel.  28 U.S.C. § 46(d).

[**]Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

Counsel for Intervenor Petitioner

Arthur F. Rosenfeld
    General Counsel
John E. Higgins, Jr.
    Deputy General Counsel
John H. Ferguson
    Associate General Counsel
Aileen A. Armstrong
    Deputy Associate General Counsel
Robert J. Englehart, Esquire
Steven B. Goldstein, Esquire (Argued)
Meredith L. Jason, Esquire
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C.   20570

Counsel for Respondents/Cross Petitioner

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

This appeal arises from the final decision of the National Labor Relations Board (the "NLRB") interpreting a collective bargaining agreement's no-strike/no-lockout provision. Engelhard Corporation ("Engelhard" or the "Company"), relying on its interpretation of the provision, suspended thirty-

3

eight employees for holding a demonstration at its annual shareholders' meeting. For the reasons set out below, we agree with the NLRB that Engelhard's employees did not contravene that provision. Thus, we deny the petition for review of the Board's decision that Engelhard's suspension of the employees violated subsections 8(a)(1) and (3) of the National Labor Relations Act (the "NLRA"), and grant the NLRB's application for enforcement of that decision.

## I. Factual and Procedural Background

Engelhard manufactures and distributes pigments and film products at various locations throughout the United States. Local 1430, International Brotherhood of Electrical Workers, AFL-CIO (the "Union") represents approximately 288 employees in five of Engelhard's New York facilities, including the plant located in Peekskill, New York. At all relevant times, Engelhard's Peekskill employees were covered by a collective bargaining agreement (the "CBA") binding both Engelhard and the Union.

Article 28 of the CBA included a no-strike/no-lockout provision that stated:

> The Employer and the Union declare it to be their intention to prevent any suspension of work due to labor disputes during the term of this Agreement. To carry out this intention, the

Employer agrees that there shall be no lockout of any of its Employees or discrimination against them because they have raised a dispute or grievance. The Union agrees that it will not call, participate in, or sanction, during the term of this Agreement, any strike, boycott, picketing, work-stoppage or slow-down whatsoever. The Union further agrees that any Employee engaging in an unauthorized strike, boycott, picketing, organized work slowdown or stoppage, or any other type of interference with the Employer's business, shall be subject to immediate discharge at the discretion of the Employer with no recourse to the grievance procedure contained herein.

However, the Employer agrees that it will not hold the Union responsible for damages resulting from any such unauthorized action if the Union takes immediate action to advise all Employees that such unauthorized action is unauthorized and that Employees participating will by subject to discipline, up to and including discharge.

The CBA was due to expire on June 30, 2000. In anticipation of that expiration date, the Union and Engelhard held negotiations for a successor agreement on March 8, 21, and 27. The discussions broke off, however, prior to formalizing any new agreement. The Union aspired to return to the bargaining

5

table. Indeed, in order to put pressure on the Company to resume negotiations, the Union decided to picket Engelhard's May 4, 2000 shareholders' meeting at the Sheraton Hotel in Woodbridge, New Jersey, a location some fifty miles from Engelhard's plant in Peekskill.

On April 28, Union Business Agent Robert Meyer left a message with Engelhard's Senior Vice President to provide notice of its plans to picket the shareholders' meeting. Engelhard's Director of Human Resources, Joel Gray, returned the call and informed Meyer that, in the Company's view, the proposed picketing violated the no-strike/no-lockout provision of the CBA. The Union disagreed, stating that because Article 28 applied only to concerted activity resulting in a work stoppage or affecting production, it did not cover the Union's peaceful picketing of the shareholders' meeting. The same day, Engelhard sent a letter to the Union, which Englehard posted at the Peekskill plant, expressing its position that the planned picketing violated Article 28 of the CBA. The letter further warned that any employee who engaged in picketing at the shareholders' meeting would be subject to immediate discharge.

On May 4, approximately fifty Company employees from its Peekskill plant, accompanied by fifteen to twenty non-employees, participated in a demonstration outside the Sheraton Hotel in Woodbridge. Of the fifty employees who took part in the demonstration, only three were scheduled to work at the time of the demonstration, and each of them had received

6

advance permission from the Company to miss work on May 4. Some of the non-employees carried picket signs indicating that the Union had filed unfair labor practice charges against Engelhard while other non-employees distributed handbills complaining that the Company had broken off contract negotiations. None of the participants chanted, blew whistles or otherwise made any noise. Rather, the demonstrators engaged in a silent protest, obeying all of the rules given by the police. The Peekskill employees stood next to the non-employee picketers and handbill distributors for approximately one hour, the duration of the protest.

Engelhard concedes it videotaped the demonstration. According to Engelhard, it recorded the demonstration in the event the participators attempted to disrupt the meeting or it decided to seek an injunction. It is undisputed that no protester disrupted the shareholders' meeting or prevented individuals or vehicles from either entering or exiting the hotel.

On May 12, Engelhard sent the Union a second letter (which also was posted in the Peekskill plant). Among other things, this communication declared that Engelhard intended to take formal disciplinary action against both the employees who participated in the demonstration and the Union for violating Article 28 of the CBA.

Engelhard used the May 4 videotape recording to identify those employees who participated in the demonstration,

7

and then suspended each of them for three days. The Union filed grievances over the suspensions, which Engelhard refused to arbitrate. It maintained that the grievances were not arbitrable because the employees picketed in violation of the CBA and thus had no recourse to its grievance procedures.

The Union followed up by filing unfair labor practice charges with the NLRB. The NLRB's general counsel issued a consolidated complaint alleging that Engelhard had committed a variety of unfair labor practices in violation of subsections 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3). Engelhard filed an answer to that complaint, denying all charges. At the conclusion of an evidentiary hearing, an administrative law judge (ALJ) issued a decision holding that it violated subsection 8(a)(1) of the NLRA by threatening employees with discharge if they engaged in Union activity and surveilling employees engaged in Union activity. The ALJ also ruled that Engelhard violated subsection 8(a)(3) of the NLRA by suspending employees for participating in a Union demonstration at the Company's annual shareholders' meeting. Timely exceptions were filed by Engelhard to the NLRB, which issued an opinion, over one dissent, affirming the ALJ. This appeal followed.[1]

---

[1]The NLRB exercised jurisdiction over this proceeding under 29 U.S.C. § 160(a) and (b). Its decision was a final order with respect to all the parties. 29 U.S.C. § 160(c). Because the alleged unfair labor practice occurred within this Circuit, we

8

## II.  Standard of Review

Whether Article 28 of the CBA waived the employees' right to picket Engelhard's shareholders' meeting turns exclusively on the interpretation of the parties' labor contract. While we review the NLRB's findings of fact under a deferential standard and thus "accept the Board's factual determinations and reasonable inferences derived [therefrom] . . . if they are supported by substantial evidence," *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001) (internal citation and quotations omitted); *see also* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."), we "'owe no particular deference to the Board on matters of contract interpretation." *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 458 (3d Cir. 1981) (quoting *Dow Chemical Co. v. NLRB*, 636 F.2d 1352, 1358 (3d Cir. 1980)).  Accordingly, we construe *de novo* the language of Article 28 of the CBA.

## III.  Merits

Section 7 of the NLRA grants employees the "right to self-organization, to form, join, or assist labor organizations . . . and to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29

exercise jurisdiction pursuant to 29 U.S.C. § 160(e) and (f).

9

U.S.C. § 157.  Section 8 states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of their Section 7 rights, 29 U.S.C. § 158(a)(1), or to discriminate with "regard to hire or tenure or employment or any term or condition of employment to . . . discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).  Indeed, it is well-settled that "Section 7 of the NLRA protects the right of employees to observe lawful picket lines."  *Int'l Bhd. of Elec. Workers, Local 803, AFL-CIO v. NLRB*, 826 F.2d 1283, 1287 (3d Cir. 1987).

It is equally well settled that the statutory right to strike may be waived in a collective bargaining agreement. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 290 (1956); *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 (1953); *Delaware Coca-Cola Bottling Co. v. Gen. Teamsters Local Union 326*, 624 F.2d 1182, 1184 (3d Cir. 1980).  Any waiver of the employees' right to engage in this activity, however, must be "clear and unmistakable."  *Metro. Edison Co. v. NLRB*, 663 F.2d 478, 482 (3d Cir. 1981); *see also United Steelworkers v. NLRB*, 536 F.2d 550, 555 (3d Cir. 1976) ("a waiver of a statutory right must be clearly and unmistakably established, . . . and express language will not be read expansively").  "The extent of the waiver . . . turns upon the proper interpretation of the particular contract . . .  [which] must be read as a whole and in light of the law relating to it when made."  *Delaware Coca-Cola*, 624 F.2d at 1184 (citing *Food Fair Stores, Inc. v.*

10

*NLRB*, 491 F.2d 388, 395 (3d Cir. 1974) (additional citations and quotations omitted)).

Thus, any analysis of the waiver issue must begin with an identification of the no-strike obligation in the parties' contract and a determination of its scope. As we recognized in *Delaware Coca-Cola*, the complexity of the waiver determination is compounded by the fact that "the union's no-strike obligation may be created in one of two ways: by implication from the arbitration clause or by an express clause in the contract." 624 F.2d at 1185. We are concerned here solely with the scope of an express no-strike obligation in the CBA (which includes a picketing prohibition).

Engelhard argues that the plain meaning of the third sentence of Article 28 – "The Union agrees that it will not call, participate in, or sanction, during the term of this Agreement, any strike, boycott, picketing, work-stoppage or slow-down whatsoever." – is a "clear and unmistakable waiver" of the Union's Section 7 right to picket. Forgoing any "picketing . . . whatsoever," the argument continues, includes not only Englehard's facilities but also its annual shareholders' meeting. Moreover, because the Union's picketing was unauthorized, it follows that Engelhard's acts of threatening employees with discipline, videotaping the demonstration, and suspending employees who participated in the demonstration, do not constitute unfair labor practices. Put another way, Engelhard's position is that its threats, surveillance and suspensions did not

11

violate subsections 8(a)(1) and (3) of the NLRA because the Union's picketing constituted unprotected activity.

The NLRB rejected Engelhard's contentions and held that the language and structure of Article 28 demonstrate that the Union did not clearly and unmistakably waive the employees' right to engage in picketing of the Company's meeting of shareholders. This conclusion relies heavily on the first sentence of Article 28, which states that the parties "declare it to be their intention to prevent any suspension of work due to labor disputes." According to the Board, that statement of intent "qualifies and informs" both the no-picketing obligation that the Union agreed to undertake in Article 28's third sentence and the no-lockout obligation of Engelhard in Article 28's second sentence. Indeed, subsequent to the parties' declaration that it was "their intention to prevent any suspension of work due to labor disputes," Article 28 provides that "*[t]o carry out this intention*, the Employer agrees that there shall be no lockout of any of its Employees . . . ," while "[t]he Union agrees that it will not call, participate in, or sanction . . . . any . . . picketing." (Emphasis added.) Thus, while Article 28 waives the employees' right to engage in any picketing that does, or could reasonably be expected to, result in a suspension of work, it does not waive the employees' right to engage in picketing that does not, or could not reasonably be expected to, lead to a suspension of work at an Engelhard facility.

The NLRB further reasoned that the state of the law

12

when the Union and Engelhard negotiated Article 28 of the CBA provides additional support for the conclusion that the Company failed to carry its burden[2] of showing that the Union clearly and unmistakably waived the employees' right to engage in picketing the shareholders' meeting. *See Mastro Plastics Corp.*, 350 U.S. at 279 (holding that collective-bargaining agreement "must be read as a whole and in light of the law relating to it when it was made"). This is because there is no dispute that the "clear and unmistakable" waiver standard was well established long before the Union and Engelhard negotiated the July 1997 CBA. *See Delaware Coca-Cola*, 624 F.2d at 1187-88 (noting that the general rule is that a "waiver must be clear and unmistakable and that explicit language must not be read expansively"). In this context, both Engelhard and the Union "presumably knew that unambiguous contractual language would have been necessary to create an absolute prohibition against picketing." NLRB Br. at 24. Accordingly, "the parties surely would not have used the suspension of work language in Article 28 if their intent was to foreclose picketing that did not involve a suspension of work." *Id.* at 24-25 (internal quotations omitted).

Although no-strike clauses are common in collective bargaining agreements, *see Mastro Plastics Corp.*, 350 U.S. at

---

[2]*See Mastro Plastics Corp.*, 350 U.S. at 277 (whether a work stoppage is unprotected because it violates a no-strike clause is an affirmative defense).

280 (stating "collective-bargaining contracts frequently have included certain waivers of the employees' right to strike"), cases of our Court interpreting those provisions are few in number and not particularly on point. This is because our Court has never been tasked with resolving a factually analogous case involving a union's claim that certain concerted activity – be it striking, boycotting, or picketing – is exempt from a broad no-strike provision on the basis that the activity at issue did not, and was not reasonably likely to, lead to a work stoppage.

Engelhard nevertheless relies heavily on *International Brotherhood of Electrical Workers, Local 803, AFL-CIO v. NLRB*, 826 F.2d 1283 (3d Cir. 1987), where we interpreted a no-strike/no-lockout provision of a collective bargaining agreement negotiated between a union (Local 803) and its employer (Metropolitan) to prohibit sympathy strikes.[3] In that case, a crew of Metropolitan employees, represented by the

---

[3]This provision of the Metropolitan-Local 803 collective bargaining agreement stated:

> The Brotherhood and its members agree that during the term of this agreement there shall be no strikes or walkouts by the Brotherhood or its members, and the Company agrees that there shall be no lockouts of the Brotherhood or its members, it being the desire of both parties to provide uninterrupted and continuous service to the public.

*Int'l Bhd. of Elec. Workers,* 826 F.2d at 1290.

14

Local 803 and assigned to preform work at a particular site, refused to enter that site and complete a work assignment when confronted by a different union's picket line. 826 F.2d at 1285. Metropolitan advised Local 803 that a continuing refusal by its members to cross the picket line would result in disciplinary action, including suspensions. *Id.* In response, the union filed a charge against Metropolitan alleging that the company's disciplinary threats had interfered with, restrained, and coerced the employees in the exercise of their rights under Section 7 of the NLRA. *Id.* Metropolitan maintained that, by agreeing to a broad no-strike clause in its labor contract, Local 803 had clearly and unmistakably waived its employees' rights to engage in the sympathy strike. *Id.* The union disagreed, asserting that the clear and unmistakable standard requires more than a broad statement of waiver. *Id.* at 1290.

Our Court dismissed Local 803's contention that "a broad no-strike claim can never constitute a clear and unmistakable waiver of the right of employees to honor a picket line." *Id.* at 1290-91. We subsequently rejected the Local's argument that the particular no-strike agreement in its contract with Metropolitan did not clearly and unmistakably waive its members' right to honor stranger picket lines.

> [I]n addition to the expression in the no-strike clause of "the desire of both parties to provide uninterrupted and continuous service to the public," . . . "the contract contains other

15

references to the need for . . . [Metropolitan] to provide continuous service to its customers." . . . The parties' repeated expression of their mutual purposes to maintain service without interruption, in conjunction with the functional independence of Article XI, is thus consistent with the view that the no-strike clause encompasses all actions, including sympathy strikes, that would frustrate that purpose. . . . Indeed, a fair reading of the collective bargaining agreement as *a whole* establishes an intention to waive the employees' right to engage in sympathy strikes.

*Id*. at 1295-96 (emphasis added).

Despite Engelhard's contentions to the contrary, *International Brotherhood* is not controlling here. Our Court was not asked to determine whether Local 803's sympathy strike did, or could reasonably be expected to, result in an interruption or suspension of Metropolitan's service to the public. Such an inquiry was entirely unnecessary because it was undisputed that the employees' refusal to cross a sister union's picket line and complete their work assignments resulted in an interruption in Metropolitan's service.

Indeed, a discerning read of *International Brotherhood*

16

reveals that its reasoning supports the result we reach here, for it refused to read broad contractual language in isolation. Rather, it closely examined the language and structure of the contract before it and ruled that the particular strike at issue – Local 803's sympathy strike – conflicted with the parties' mutual intent "to provide uninterrupted and continuous service." Simply stated, *International Brotherhood* is on all fours with the Board's position that the appropriate inquiry here is whether the Union's May 4 picket of an off-site shareholders' meeting conflicted with the parties' mutual intent "to prevent work stoppages." *Silver State Disposal Serv.*, 326 NLRB 84, 86 (1998) (quoting *Elec. Workers Local 1395 v. NLRB*, 797 F.2d 1027, 1036 (D.C. Cir. 1986) (In interpreting a no-strike/no-lockout provision, "the parties' actual intent governs, 'whether that intent is established by the language of the clause itself, by the inferences drawn from the contract as a whole, or by extrinsic evidence.'").[4]

With the prohibition against reading express language expansively, *see United Steelworkers*, 536 F.2d at 555, and the reasoning of *International Brotherhood* in mind, we agree with the Board that the parties' mutual statement of intent in the first sentence of Article 28 to prevent the stoppage of work due to labor disputes qualifies and informs the parties' mutual undertakings in the second and third sentences. It is particularly

---

[4]As the parties have not presented any extrinsic evidence, we rely exclusively on the language of Article 28.

17

relevant that the parties expressly stated their intention to prevent the suspension of work and explained that it is "[t]o carry out this intention" that they undertook the various commitments stated in the remainder of Article 28. This unqualified expression of the mutual purpose to prevent work stoppages is consistent with the view that the no-strike clause includes all actions, including pickets, that would frustrate that purpose.

But when work is not stopped, nor even impeded, Article 28's picketing prohibition is not in play. Indeed, any attempt to read Article 28's third sentence in isolation renders the first sentence, which lays out the purpose for the entire article, meaningless and runs contrary to the well established principles of contract construction – to read, if possible, all provisions of a contract together as a harmonious whole. *See Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1130 n.31 (3d Cir. 1969) (district court erred "in isolating one phrase of the . . . clause to reach its conclusion that the contract language was clear and unambiguous"); Restatement (Second) of Contracts: Rules In Aid of Interpretation § 202 cmt. d ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph.").[5]

---

[5]Further supporting our conclusion is that the explanatory language in the first and second sentences of Article 28 spawns ambiguity concerning the breadth of the "no picketing

18

\*   \*   \*   \*   \*

Because the Union's activity at the shareholders' meeting could not reasonably have been expected to, and in fact did not, lead to the suspension of any work at the Peekskill plant, we hold that activity was not prohibited by Article 28 of the CBA. Accordingly, we deny Engelhard's petition for review and grant the NLRB's application for enforcement.

---

whatsoever" prohibition. As a practical matter, an ambiguous provision (standing alone) can never amount to a clear and unmistakable waiver. *See NLRB v. Gen. Tire & Rubber Co.*, 795 F.2d 585, 588 (6th Cir. 1986) (ambiguous language in bargaining agreement is insufficient to demonstrate waiver).