INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL 803, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Metropolitan Edison
Company, Intervenor.

No. 86–3302.

United States Court of Appeals,
Third Circuit.

Argued Dec. 18, 1986.

Decided Aug. 19, 1987.

Rehearing and Rehearing In Banc
Denied Sept. 16, 1987.

Jonathan Walters, Alaine S. Williams (argued), Kirschner, Walters and Willig, Philadelphia, Pa., for petitioner.

Christopher Young, Paul Spielberg, Elliott Moore, Appellant Court Branch/NLRB, Washington, D.C., Patrick Szymanski (argued), Philadelphia, Pa., for respondent.

Paul R. Lewis (argued), Kleinbard, Bell and Brecker, Philadelphia, Pa., for intervenor.

Before HIGGINBOTHAM and BECKER, Circuit Judges, and DUMBAULD, District Judge.[*]

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal arises from the decision and order of the National Labor Relations Board ("Board") dismissing the complaint of petitioner, Local 803, International Brotherhood of Electrical Workers, AFL-CIO ("Local 803" or "the union"). Petitioner's complaint alleged that the Metropolitan Edison Company ("Metropolitan" or "the Company") violated § 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(a)(1) (1982), when it threatened to discipline Local 803 employees for their refusal to cross a picket line established by another union. The central issue on this appeal is whether the Board reasonably concluded that the general no-strike clause in the parties' collective bargaining agreement waived the employees' right to engage in a sympathy strike. In making this determination, we are asked to consider the continued vitality of the decision of this Court in *Delaware Coca-Cola Bottling Co. v. General Teamsters Local Union 326*, 624 F.2d 1182 (3d Cir.

[*] Honorable Edward Dumbauld, United States District Judge for the Western District of Penn-

1980) (*"Delaware Coca-Cola"*). For the reasons set forth below, we will affirm the decision and order of the Board.

## I.

The facts of this case are essentially undisputed. Metropolitan Edison Company is an electric utility licensed and regulated by the Commonwealth of Pennsylvania. The Company provides electricity to approximately 300,000 customers in Eastern Pennsylvania. Its main corporate headquarters are located in Reading, Pennsylvania. Four operating divisions are located in York, Reading, Lebanon and Easton, Pennsylvania. Approximately 1,600 of Metropolitan's operating employees are represented by the International Brotherhood of Electrical Workers, AFL-CIO. These employees are organized into five local unions—Local 1261 in York; Local 803 in Reading; Local 1482 in Lebanon; Local 603 in Easton; and Local 563 in Middletown—which bargain jointly for one unified bargaining agreement applicable to the entire utility system.

The collective bargaining agreement between Metropolitan and the Union relevant to this appeal was effective from May 1, 1981, through April 30, 1983. Article IX of the agreement, entitled **"GRIEVANCES and ARBITRATION"** provides in pertinent part:

9.1 A Grievance is hereby defined as a violation of the law governing employer-employee relationship, or a violation of the terms of this agreement, or any type of supervisory conduct which unjustly causes any employee to lose his/her job or any benefits arising out of his/her job.

9.2 Should a dispute arise between the Brotherhood and the Company as to any unadjusted grievance or as to the rights of either party under this agreement, both parties shall endeavor to settle such matters, as promptly and timely as possible under the circumstances, in the simplest and most direct manner....

sylvania, sitting by designation.

Joint Appendix ("Jt.App.") at 57. A four-step grievance procedure, culminating in arbitration "binding upon the Company and upon the Brotherhood for the term of th[e] agreement" is also set forth in Article IX. *Id.* Article XI of the agreement, entitled **"NO STRIKES–NO LOCKOUTS"**, provides:

> 11.1 The Brotherhood and its members agree that during the term of this agreement there shall be no strikes or walk-outs by the Brotherhood or its members, and the Company agrees that there shall be no lockouts of the Brotherhood or its members, it being the desire of both parties to provide uninterrupted and continuous service to the public.

*Id* at 58. Identical language has appeared in all prior contracts between the parties for a period of at least twenty-five years. *See id.* at 2, 117, 140.

During the spring of 1981, Metropolitan was engaged in the installation of a transformer to provide service to the new operating headquarters building of the Berks TV Cable Company ("Berks TV") in Reading, Pennsylvania. Between April 8 and June 22, 1981, the Reading Building and Trades Council maintained an informational picket line at the building site. On June 15, 1981, a crew of Metropolitan employees, represented by Local 803 and assigned to perform work at the Berks TV site, was confronted by informational pickets. On that occasion, the crew chose to wait until the pickets had departed before entering the site and completing the assigned installation. On June 18, a second crew of Metropolitan employees assigned to install connecting devices there withdrew from the work site when confronted by the construction union's picket line.

On June 22, a Company representative advised Local 803 that a continuing refusal by its members to cross the picket line at the Berks TV work site would result in disciplinary action, including suspensions. Thereafter, the employees represented by Local 803 crossed the picket lines at the work site. The work was completed during the period between June 23 and June 28, 1981. No disciplinary action was taken against any employee as a result of the incident at the Berks TV project.

On August 5, 1981, Local 803 filed a charge against Metropolitan alleging that, in violation of § 8(a)(1) of the NLRA,[1] Metropolitan had interfered with, restrained, and coerced the employees in the exercise of their rights under § 7 of the NLRA, 29 U.S.C. § 157 (1982),[2] when it threatened to discipline the employees for their refusal to cross the informational picket line. A hearing on this charge was conducted before an Administrative Law Judge ("ALJ") on November 9, 1982.

On February 11, 1983, the ALJ issued his decision that Metropolitan's conduct constituted a violation of § 8(a)(1) of the NLRA. Relying on *Operating Engineers Local Union 18 (Davis-McKee, Inc.)*, 238 N.L.R.B. 652 (1978) (*"Davis-McKee "*), the ALJ reasoned that, absent extrinsic evidence concerning the parties' intent, the general no-strike clause contained in the parties' contract could not be read to clearly and unmistakably waive the employees' statutorily protected right to engage in a sympathy strike. Specifically, the ALJ found that an earlier stipulation by the General Counsel for the union, in a separate unfair labor practice proceeding involving Local 563,—one of Local 803's sister locals—that a sympathy strike by Metropolitan employ-

---

**1.** Section 8(a)(1) provides:
   (a) It shall be an unfair labor practice for an employer—
      (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title....
   29 U.S.C. § 158(a)(1).
**2.** Section 7 of the NLRA provides:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through rep-

resentatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized by section 158(a)(3) of this title.
   29 U.S.C. § 157 (1982).

ees was in contravention of the no-strike clause in the parties' contract,[3] was not intended to and did not "finally resolve the question whether the contract prohibited sympathy strikes or refusals to cross other unions' picket lines."[4] Jt.App. at 122. In addition, the ALJ noted that the clause itself made no specific reference to sympathy strikes; that "the record [wa]s devoid of evidence concerning discussions, if any, of the no-strike clause or any other arguably related contract provisions," Jt.App. at 123; and that there was no evidence concerning the parties' intent when they agreed to contractual language indicating their mutual desire to provide uninterrupted and continuous service to the public. Consequently, the ALJ determined that a waiver of statutorily protected rights could not be inferred. *See* Jt.App. 122–23.

The ALJ also expressly found that "the evidence indicates that [the question whether the no-strike clause prohibits sympathy strikes] has been a matter of dispute for many years." Jt.App. at 124. To support this observation, the ALJ cited the positions advanced by two of Local 803's sister locals in prior arbitration proceedings, *viz.*, that (1) Local 603 members could not be required to cross a picket line if it were unsafe to do so,[5] and (2) the refusal by Local 563 members to cross a picket line established by another union did not constitute a work stoppage under the collective bargaining agreement. Finally, the ALJ found that two prior arbitration awards in which the no-strike provision at issue was construed as prohibiting sympathy strikes could not be viewed as extensions of the current contract. This determination was based on the ALJ's view (1) that the prior awards were binding only for the term of predecessor contracts, and (2) that, in any event, the awards were entitled to no deference on the issue of contract interpretation. As to the latter point, the ALJ found that

because the arbitrators in the two prior proceedings "based their decisions on the premise that the no-strike clause, on its face, prohibited unit employees from refusing to cross the picket lines of other unions[,] ... [and failed to] consider[ ] extrinsic evidence on the meaning of the clause[,] ... [they] thereby interpreted the article in a manner contrary to the Act, as interpreted by the Board, and [in a manner] which infringed upon employee rights protected under the Act." Jt.App. at 124. Finding, therefore, no indication that the union waived the right of its members to refuse to cross picket lines of other unions, the ALJ held that Metropolitan's threat of discipline violated the rights of Local 803 employees.

Upon review, the Board issued its decision reversing the ALJ and dismissing the complaint. The Board cited its decision in *Indianapolis Power & Light Co.*, 273 N.L.R.B. 1715 (1985), *remanded sub nom. Local Union 1395, Electrical Workers v. NLRB*, 797 F.2d 1027 (D.C.Cir.1986) ("*Indianapolis Power*"), which held that, absent extrinsic evidence that the parties intended otherwise, a broad no-strike clause waives the employees' right to engage in sympathy strikes. *Indianapolis Power* overruled the Board's previous holding in *Davis-McKee* that, absent extrinsic evidence or express contractual language to the contrary, a broad no-strike clause would not constitute a waiver of employees' statutorily protected right to sympathy strike. In reversing the determination of the ALJ, the Board here determined that there was "no evidence, either in bargaining history or past practice, demonstrating that the parties expressly excluded sympathy strikes from coverage of the no-strike clause." Jt.App. at 142. Accordingly, applying the *Indianapolis Power* rule, the Board concluded that by agreeing to a gen-

---

3. Locals 563 and 803 share the same collective bargaining agreement with Metropolitan Edison. *See* supra.

4. The ALJ found that the "General Counsel, by his stipulation, indicated an intention to *avoid* litigation of the question of contractual waiver." Jt.App. at 122 (emphasis in original).

5. The ALJ considered "Local 603's concept of safety ... so broad as to effectively leave the employees free to refuse to cross even a peaceful and orderly picket line." Jt.App. at 124.

eral no-strike clause, Local 803 waived its members' rights to engage in a sympathy strike. Consequently, Metropolitan did not violate § 8(a)(1) when it threatened its employees with discipline if they continued to refuse to cross the construction union's picket line. This appeal followed.

We have jurisdiction pursuant to § 10(f) of the NLRA, 29 U.S.C. § 160(f) (1982). An order of the Board is customarily entitled to enforcement if its findings are supported by substantial evidence and the order is consistent with the policies of the NLRA. The Board's interpretation of the Act must be upheld unless it represents "an unreasonable or an unprincipled construction of the statute...." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1978). Although the Board may interpret collective bargaining agreements when raised as defenses in unfair labor practice proceedings, *see NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), in this Circuit "courts 'owe no particular deference to the Board' on matters of contract interpretation." *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 458 (3d Cir.1981) (quoting *Dow Chemical Co. v. NLRB*, 636 F.2d 1352, 1358 (3d Cir.1980)).

## II.

Local 803 advances two principal arguments: first, that the *Indianapolis Power* rule is inconsistent with the statutory protection accorded employees' § 7 right to honor stranger picket lines and with settled principles governing the interpretation of collective bargaining agreements; and, second, that under the law of this Circuit, Local 803 has not waived its members' statutory rights to honor a stranger picket line. We begin our analysis of petitioner's contentions with an overview of the relevant legal principles and applicable case law.

Section 7 of the NLRA protects the right of employees to observe lawful picket lines. 29 U.S.C. § 157 (1982). This right, however, may be waived in a collective bargaining agreement. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 290, 76 S.Ct. 349, 362, 100 L.Ed. 309 (1956) ("*Mastro Plastics*"); *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73, 73 S.Ct. 519, 521, 97 L.Ed. 832 (1953) ("*Rockaway News*"); *Delaware Coca-Cola*, 624 F.2d at 1184. The waiver of the employees' statutory right to engage in sympathy strikes must be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 663 F.2d 478, 482 (3d Cir.1981), *aff'd*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983); *see also United Steelworkers v. NLRB*, 536 F.2d 550, 555 (3d Cir.1976) ("a waiver of a statutory right must be clearly and unmistakably established, ... and express language will not be read expansively"). "The extent of the waiver ... ' "turns upon the proper interpretation of the particular contract ... [which] must be read as a whole and in light of the law relating to it when made." ' " *Delaware Coca-Cola*, 624 F.2d at 1184 (quoting *Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388, 395 (3d Cir.1974) (quoting *Mastro Plastics*, 350 U.S. at 279, 76 S.Ct. at 356)). Thus, any analysis of the waiver issue must begin with an identification of the no-strike obligation in the parties' contract and a determination of its scope. As this Court recognized in *Delaware Coca-Cola*, the complexity of the waiver determination is compounded by the fact that "the union's no-strike obligation may be created in one of two ways: by implication from the arbitration clause or by an express clause in the contract."[6]

---

**6.** Beginning in *NLRB v. Rockaway News Supply*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953) ("*Rockaway News*"), the Supreme Court has indicated that express contractual language may be sufficient to waive the rights of employees to engage in sympathy strikes. *See id.* at 80, 73 S.Ct. at 524. *Rockaway News* involved the discharge of a newspaper deliveryman for his refusal to cross a picket line established by another union. Quoting the language of the broadly worded no-strike provision, the Court concluded that the union had not explicitly secured an exception authorizing employees to engage in sympathy strikes. The employee's discharge did not therefore constitute an unfair labor practice.

Where no express provision prohibiting strikes by the union appears in the collective

624 F.2d at 1185. We are concerned here with the scope of an express no-strike obligation in the collective bargaining agreement.

Before focusing on the waiver issue with regard to the particular contract before us, it is necessary to review briefly the evolution in this Circuit of the standards governing the identification and interpretation of the union's no-strike obligation. In *United States Steel Corp. v. UMW*, 548 F.2d 67 (3d Cir.1976) (*"U.S. Steel II"*), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977), this Court considered "whether a union can be held liable to an employer in money damages for the refusal of union members to cross a stranger picket line when the collective bargaining agreement between the union and the employer provides a detailed grievance-arbitration procedure but contains no express no-strike clause." *Id.* at 69. We held that whether the union could be held liable depended upon whether there existed a contractual duty on the union not to strike. Examining Supreme Court precedent, we noted that the Court's then recent decision in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) (*"Buffalo Forge"*),[7] made clear that the duty not to engage in sympathy strikes was not implicit in the existence of a mandatory arbitration clause. *Id.* at 73 & n. 13. Thus, we concluded that, in the absence of an express no-strike clause, from which the duty could arguably arise, a union could not be liable for monetary damages resulting from a sympathy strike, unless the collective bargaining agreement provided for arbitration procedures *and*

---

bargaining agreement, however, the Supreme Court has invoked the doctrine of coterminous interpretation to determine both the existence and scope of the union's duty not to strike. "Coterminous interpretation means that if the subject matter of the strike is arbitrable, then the strike violates the no-strike clause." *Delaware Coca-Cola*, 624 F.2d at 1185. *Local 174, Teamsters v. Lucas Flour*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) (*"Lucas Flour"*), held that in the absence of an express no-strike provision, an arbitration clause creates an implied no-strike obligation as to matters subject to that clause. *See id.* at 104–05, 82 S.Ct. at 557. Put otherwise, the duty not to strike would be deemed as coterminous with the duty to arbitrate. Accordingly, "a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement." *Id.* at 105, 82 S.Ct. at 577.

**7.** In *Buffalo Forge*, the Court refined its analysis of enjoinable strikes under § 4(a) of the Norris-LaGuardia Act, 29 U.S.C. § 104 (1982), which proscribes injunctions "in any case involving or growing out of any labor dispute." In *Boys Markets, v. Retail Clerk's Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (*"Boys Market"*), the Court had held that § 4(a) does not preclude a district court from enjoining a strike where the court first determines that the strike is clearly in violation of the union's express no-strike obligation under the relevant collective bargaining agreement. Subsequently, in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974) (*"Gateway Coal"*), the Court applied the doctrine of coterminous interpretation in the context of the anti-injunction provision of the Norris-LaGuardia Act. *Gateway Coal* thus extended the *Boys Market* rationale, holding that an injunction also may issue, without violating § 4(a), where the no-strike obligation arises from coterminous interpretation of the arbitration clause and the duty not to strike. That is, where the no-strike obligation is implied from the arbitration clause, an order enjoining a strike over a dispute subject to mandatory arbitration does not contravene the anti-injunction provision of the Norris-LaGuardia Act.

The issue in *Buffalo Forge* was "whether a federal court may enjoin a sympathy strike pending the arbitrator's decision as to whether th[at] strike is forbidden by the express no-strike clause ... in the collective bargaining contract." 428 U.S. at 399, 96 S.Ct. at 3143. Responding in the negative, the Court held that § 4(a) does not permit the enjoining of a strike over a nonarbitrable issue pending arbitration of whether the strike violates the express no-strike clause, even if the strike is later determined to be in violation of the parties' no-strike agreement. *Id.* at 410–11, 96 S.Ct. at 3149. *See also Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 721, 102 S.Ct. 2672, 2685, 73 L.Ed.2d 327 (1982) (*"Buffalo Forge* makes it clear that a *Boys Market* injunction pending arbitration should not issue unless the dispute underlying the work stoppage is arbitrable."). Rather, the extent to which an explicit no-strike clause is enforceable by a *Boys Market* injunction is coterminous with the scope of the contractual arbitration provision. As the *Buffalo Forge* Court explained, the question whether a strike violates an express no-strike clause is analytically distinct from the question whether a strike is enjoinable. Thus, a strike pending arbitration is enjoinable only to the extent that a duty to arbitrate the underlying dispute is expressed or implied in the contract.

the dispute that precipitated the stoppage was subject to binding arbitration under the terms of the agreement. *Id.* at 72.

Subsequently, in *Delaware Coca-Cola,* we considered the question left open by *U.S. Steel II:* "whether an express no-strike clause . . . would waive the right to engage in a sympathy strike." 624 F.2d at 1185. Focusing on the notion of coterminous interpretation employed by the *U.S. Steel II* Court, we stated that that reasoning "le[d] us to the conclusion that general language, by itself, is not explicit enough to waive the right to sympathy strike." 624 F.2d at 1185. Thus, "[t]he quid pro quo rationale underlying coterminous interpretation also applies where the union actually gives up its right to strike instead of having it implied from the arbitration clause." *Id.* at 1186.

Finally, in *Pacemaker Yacht,* faced again with the question whether an express no-strike clause waived the right of employees to engage in a strike over a nonarbitrable issue, we held that the express no-strike clause there involved constituted a "clear and unmistakable" waiver of the employees' right to engage in the challenged strike. Clarifying our prior holding in *Delaware Coca-Cola,* we explained that "[t]he principle of coterminous interpretation . . . is not a rule of law, but merely a tool of contract interpretation, . . . which 'must be applied to the facts of each case.'" 663 F.2d at 457–58. Accordingly, we specifically declined to read *Delaware Coca-Cola* for the proposition that "a general no-strike clause may never waive the right to strike over unspecified, nonarbitrable disputes." *Id.* at 459–60.

### A.

■ We turn now to the discrete issues raised by this appeal. Petitioner first maintains that the Board, in its decision in *Indianapolis Power,* has erected an intransigent presumption that is inconsistent with the policies and principles of the

NLRA and is irrational. Specifically, petitioner contends that the *Indianapolis Power* rule is "utterly inconsistent with the solicitude for statutory rights embodied in the 'clear and unmistakable' waiver standard," Brief for Petitioner at 19, because it "dispenses with individualized findings of intent to relinquish the rights to honor stranger picket lines, and impermissibly substitutes a presumption based on a particular type of language." *Id.* The union further cautions that an endorsement of the *Indianapolis Power* rule will result in "a substantial risk of inadvertent relinquishment" of statutory rights. *Id.* at 19. Additionally, the union maintains that the *Indianapolis Power* rule violates settled principles governing the interpretation of collective bargaining agreements.

At the outset, we cannot conclude that the *Indianapolis Power* rule is inconsistent with the policies and protections afforded employees under the NLRA. The primary purpose of the Act, "to compel employers to bargain collectively with their employees to the end that an employment contract, binding on both parties, should be made," S.Rep. No. 106, 80th Cong., 1st Sess. 15 (1947), *quoted in Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 453, 77 S.Ct. 912, 916, 1 L.Ed.2d 972 (1957), is not frustrated by a rule allowing the parties to embody, in broad contractual terms, their mutual desire to include sympathy strikes as part of their no-strike agreement. *Accord Local 1395,* 797 F.2d at 1034; *Pacemaker Yacht,* 663 F.2d at 460. This conclusion is reinforced by the decision in *Rockaway News,* where the Supreme Court, relying primarily on a broadly worded no-strike provision, enforced the Board's order dismissing a newspaper delivery man for his refusal to cross a picket line.[8] "*Rockaway News* thus establishes, at a minimum, that nothing in the Act prevents the Board or a court from finding a waiver of the right to honor picket lines in a contractual no-strike clause of suffi-

---

**8.** The Court in *Rockaway News* also considered significant an offer of proof by the employer that the union had attempted and failed to secure contract language specifically guaranteeing

the right to sympathy strike and an arbitrator's determination, consistent with the offer, that the clause did not reserve the right to sympathy strike. *See* 345 U.S. at 79–80, 73 S.Ct. at 524.

cient breadth." *Local 1395,* 797 F.2d at 1034.[9]

■ Local 803 argues, nonetheless, that the clear and unmistakable standard requires more than a broad statement of waiver. Under the union's view, a broad no-strike clause can never constitute a clear and unmistakable waiver of the right of employees to honor a picket line. This position, however, was considered and soundly rejected by the District of Columbia Circuit upon review of the Board's decision in *Indianapolis Power. See Local Union 1395, International Brotherhood of Electrical Workers, AFL–CIO v. NLRB,* 797 F.2d 1027 (D.C.Cir.1986) (*"Local 1395"*). Noting that "one might well think that finding a 'clear and unmistakable waiver' of a statutory right requires more elaborate evidentiary support than simply placing an objective construction on a contract," the court nevertheless concluded that, "[t]he relevant cases simply do not support the proposition that waiver hinges upon employees' subjective intent rather than the mutual consent reflected in a contractual commitment." *Id.* at 1031. Moreover, we find absolutely absurd Local 803's suggestion that subjective intent may stem only from the individual employees, and not from the union as an entity. This position

is completely at odds with "the premise of fair representation," *NLRB v. Magnavox, Co.,* 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974), under which Local 803's authority to negotiate contract terms arises. The possibility that "in securing the good of the entire bargaining unit, some differences in the treatment of individual union members might occur," *Metropolitan Edison Co. v. NLRB,* 460 U.S. at 707, 103 S.Ct. at 1476, does not invalidate a clear and unmistakable waiver by the union of its members' statutory rights.

As we observed in *Pacemaker Yacht,* "[f]reedom of contract is the 'fundamental premise' on which the National Labor Relations Act is based." 663 F.2d at 460 (citations omitted). To the extent that Local 803's position seeks to minimize the force of the actual contractual language employed and agreed to by the parties whenever a waiver of statutory rights is at issue, it threatens to undermine the free and open bargaining process.[10] To be certain, determining the proper construction of a particular broadly worded no-strike provision is distinct from determining whether such a clause, consistent with the clear and unmistakable standard, may ever constitute a waiver of statutory rights.[11]

---

**9.** This view is in no way undercut by the Supreme Court's subsequent holding in *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. at 349, 100 L.Ed. 309 (1956), that waiver of the right to strike in protest of an employer's unfair labor practices would not be implied absent a "compelling expression" in the contract. 350 U.S. at 283, 76 S.Ct. at 358. In *Mastro Plastics,* faced with an express, broadly worded no-strike provision, the Court rejected the argument that "the words 'any strike' ... necessarily include all strikes," *id.* at 281, 76 S.Ct. at 357, and held instead that the no-strike provision would not be construed to waive the employees' right to strike in protest of the employers unfair labor practice of coercing employees to renounce their current bargaining representative. Rather, examining the clause in context and in light of the law at the time the contract was made, the Court concluded that "the contract, taken as a whole, deal[t] solely with the economic relationship between the employers and their employees." 350 U.S. at 281, 76 S.Ct. at 357. This Court has determined that *"Mastro Plastics* can be read for the proposition that, as a rule of contract interpretation, a general no-strike clause will not be read to cover strikes in resist-

ance to unfair labor practices aimed at supplanting the bargaining representative chosen by the employees." *Dow Chemical Co. v. NLRB,* 636 F.2d 1352, 1359–60 (3d Cir.1981). Thus, *Mastro Plastics* creates no bar under the NLRA to finding waiver in a broadly worded provision. Moreover, the applicability of its rule of contract interpretation is limited to a narrow category of unfair labor practices. *See id.* at 1361 (distinguishing between the type of unfair labor practice challenged in *Mastro Plastics* and that involved in that case).

**10.** We do not mean to suggest, however, that the "plain meaning" argument advanced by the Board constitutes the proper standard under which the collective bargaining agreements must be interpreted. To the contrary, we specifically reject that argument. *See infra* note 24. Nor do we suggest that a broad no-strike clause, read in isolation, may operate to clearly and unmistakably waive the statutory right of employees to engage in sympathy strikes.

**11.** "In assessing whether a broadly-phrased no-strike clause covers sympathy strikes, however, the unexpressed reservations of employees can-

As to the former determination, whether a particular broadly worded no-strike clause encompasses sympathy strikes, appropriate safeguards must be honored. *See infra.* As to the latter, however, whether such a clause may ever constitute a waiver, we find no indication in the case law that the clear and unmistakable standard precludes a finding of waiver from a broad no-strike clause. *Cf. W–I Canteen Serv. v. NLRB,* 606 F.2d 738, 744 (7th Cir.1979) ("the parties may by express language indicate their intent to interpret the no-strike and arbitration clauses differently").

Local 803 next maintains that settled principles of contract interpretation are violated by the new Board rule. Local 803 relies, as did the petitioner before the D.C. Circuit in *Indianapolis Power,* upon cases applying the doctrine of coterminous interpretation, *see* Brief for Petitioner at 20 (citing *Buffalo Forge, Gateway Coal* and *Boys Market*),[12] and its underlying theory that "a no-strike obligation, express or implied, is the *quid pro quo* for an implied undertaking by the employer to submit grievance disputes to the process of arbitration." *Boys Market,* 398 U.S. at 248, 90 S.Ct. at 1591. Unlike the situation in *Local 1395*,[13] however, Local 803's argument, and respondent's counterargument, calls into question the scope and vitality of this Court's decision in *Delaware Coca-Cola.* Applying the doctrine of coterminous inter-

pretation to sympathy strikes, this Court has held that a refusal to cross a picket line of a stranger union is not barred by either an implied no-strike obligation arising out of an arbitration clause, *U.S. Steel, II,* 548 F.2d 67, or by an express, generally worded, broad no-strike clause, *Delaware Coca-Cola,* 624 F.2d 1182. Thus, whether coterminous interpretation, "an idea that grew up largely in the area of implied no-strike obligations," *Delaware Coca-Cola,* 624 F.2d at 1185, applies in the instant case depends on the scope of *Delaware Coca-Cola* as it has been interpreted by this Court in *Pacemaker Yacht.* Accordingly, we turn now to petitioner's claim that, under the law of this Circuit, Local 803 cannot be deemed to have waived its members' statutory rights to honor a stranger picket line.

### III.

### A.

In *Delaware Coca-Cola,* this Court considered whether a sympathy strike by production and maintenance employees at the Delaware Coca-Cola Bottling Company violated an express no-strike clause in the parties' agreement and thus entitled the employer to damages under § 301 of the LMRA, 29 U.S.C. § 185 (1982). Focusing on the language of the no-strike clause,[14] we concluded that

not be treated as dispositive; since a union's surrender of the right is not disfavored by reason of national labor policy ..., a court's task is simply to interpret the parties' manifestations of mutual consent." *Local 1395,* 797 F.2d at 1033.

**12.** Local 803's reliance on these cases involving the enjoinability of a strike under the Norris-LaGuardia Act for mandatory application of the doctrine of coterminous interpretation is misplaced. The Supreme Court has made clear that whether a strike violates an express no-strike clause is an entirely separate question from whether the strike is enjoinable. *See Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982) (work stoppage by union on Soviet ships in protest of the Soviet Union's invasion of Afghanistan was not enjoinable under Norris-LaGuardia Act because underlying dispute was not arbitrable). Thus, while the doctrine of coterminous interpretation limits a court's right to grant an injunction under the

Norris-LaGuardia Act, it imposes no immediate restriction on the court's latitude in interpreting the scope of a no-strike clause.

**13.** In *Local 1395,* the D.C.Circuit quickly disposed of petitioner's reliance on the *quid pro quo* rationale, noting that this "common sense notion [underlying the doctrine of coterminous interpretation] offers less guidance in interpreting an *express* no-strike clause." 797 F.2d at 1034 (emphasis in original). In *Delaware Coca-Cola,* however, this Court expressly held that "the quid pro quo rationale underlying coterminous interpretation also applies where the union actually gives up its right to strike instead of having it implied from the arbitration clause." 624 F.2d at 1186.

**14.** The no-strike clause at issue in *Delaware Coca-Cola* provided:
Section 1: The Union will not cause nor will any member of the bargaining unit take part in any strike, sit-down, stay-in, slow down in

a broad no-strike clause that is generally worded does not constitute a clear and unmistakable waiver of the right to a sympathy strike. Absent some contrary evidence, the notion that the no-strike clause is the quid pro quo for the arbitration clause applies with equal force where there is an express no-strike clause.

624 F.2d at 1187. Finding no extrinsic evidence indicating that the parties had intended the no-strike clause to be broader than the arbitration clause, we proceeded to examine other factors relevant to the determination whether a waiver of the right to engage in a sympathy strike was intended by the parties. First, we noted that since there was no evidence concerning the negotiation of the contract at issue, we would not consider whether evidence of bargaining history could constitute a clear and unmistakable waiver of the right to engage in a sympathy strike. *Id.* at 1188. Second, we looked at the structure of the contract and concluded that a no-strike clause is presumed to be "functionally related" to the arbitration clause and that, therefore, "[p]hysical separation or lack of cross-reference in the contract cannot constitute clear waiver of the right to sympathy strike." *Id.* Third, we determined that the law at the time the contract was made did not support a finding of clear waiver. *Id.* Finally, we declined to hold that evidence of the parties' conduct prior to and during the challenged strike evinced a clear and unmistakable waiver of the right to sympathy strike. *Id.* at 1189.

Local 803 argues that this case "is on all fours with the holding and rationale of *Delaware Coca-Cola,*" Brief for Petitioner at 30, and that "under the standards [of that decision] . . ., unless Met[ropolitan] can point to 'contrary evidence,' it is plain that the 'broad general no-strike clause in and of itself is not a clear and unmistakable waiver of the right to sympathy strike.'" *Id.* at 31 (quoting *Delaware Coca-Cola,* 624 F.2d at 1185, 1887). The Board counters that our subsequent decision in *Pacemaker Yacht,* while reaffirming the coterminous interpretation doctrine relied upon in *Delaware Coca-Cola,* limited its application to the "'facts of each case.'" *Pacemaker Yacht,* 663 F.2d at 458 (citations omitted). In other words, the Board maintains that *Pacemaker Yacht* creates some flexibility in the application of the doctrine of coterminous interpretation to express no-strike provisions.

*Pacemaker Yacht* commenced, as did the instant appeal, as an unfair labor practice proceeding. There, the union charged that the company's discharge of several employees who went on strike when a health and welfare fund defaulted on claims by the employees' beneficiaries violated § 8(a)(1) of the NLRA. As in *Delaware Coca-Cola,* the central question in *Pacemaker Yacht* was whether an express, broadly worded no-strike clause barred a strike over a nonarbitrable issue. Writing for the Court in *Pacemaker Yacht,* Judge Seitz, who also authored this Court's decision in *Delaware Coca-Cola,* explained:

> When limited by the principle of coterminous interpretation, a no-strike clause encompasses only arbitrable disputes. Therefore, a claim that the collective bargaining agreement waives the right to strike over a particular nonarbitrable dispute must be established clearly and unmistakably in order to rebut the presumption that the employees' waiver is no greater than the employers obligation under the arbitration clause. When, however, a no-strike clause is not limited by the arbitration clause, the employer need not introduce evidence that the parties intended the no-strike clause to prohibit precisely the type of strike that actually occurred. All that is required is that a comprehensive waiver extending beyond the arbitration clause be "clear and unmistakable."

*Pacemaker Yacht,* 663 F.2d at 458 (citation omitted). Proceeding from this premise, the *Pacemaker Yacht* Court first read the language of the collective bargaining

---

any operation of the Company or any curtailment of work or restriction of service or interference with the operation of the Company or any picketing or patrolling during the term of this Agreement.

624 F.2d at 1183.

agreement as a whole, and determined that the express, broadly worded no-strike clause did establish a clear and unmistakable intention to waive the employees' right to engage in the challenged strike. *Id.* As additional support, the court noted that extrinsic evidence and the state of the law at the time the agreement was made reinforced the inference, drawn from the contract language, that the parties intended to bar strikes over both arbitrable and non-arbitrable disputes. *Id.* at 459.

Both the union and the Board emphasize various distinctions between *Pacemaker Yacht* and *Delaware Coca-Cola,* and each party urges that, to the extent those opinions are inconsistent, they should be overruled.[15] Specifically, Local 803 stresses the factual similarity between this case and *Delaware Coca-Cola* and contends that application of the coterminous interpretation doctrine is mandated here. Local 803 further suggests that *Pacemaker Yacht* did not affect the holding in *Delaware Coca-Cola* and that, at any rate, it is inapplicable on these facts. Conversely, the Board maintains that *Delaware Coca-Cola* developed the coterminous interpretation doctrine independently in a § 301 proceeding and therefore may be disregarded by this Court in the instant action. Instead, it asserts that *Pacemaker Yacht* should be applied to these facts or *Delaware Coca-Cola* should be overruled.

Two primary questions are raised by the parties' contentions: first, whether *Pacemaker Yacht* legitimately modified our prior holding in *Delaware Coca-Cola;* and second, whether we may properly disregard newly articulated Board policy and apply the principles of federal contract law previously and independently developed by this Court in a § 301 proceeding.

Under the Internal Operating Procedures of this Court, no panel is authorized to overrule a prior decision of this Court.[16] Particularly here, where Judge Seitz authored *both* opinions at issue and specifically addressed the prior decision—*Delaware Coca-Cola*—in rendering the opinion of the Court in the latter—*Pacemaker Yacht,* —there is no basis for an inference of infidelity to our IOPs. Accordingly, we decline all invitations to read *Pacemaker Yacht* as inconsistent with *Delaware Coca-Cola.*[17] Moreover, a close reading of both opinions establishes that *Pacemaker Yacht* legitimately interpreted and clarified the prior panel's opinion in *Delaware Coca-Cola.*

*Delaware Coca-Cola* recognized that, "with an express [no-strike] clause, the court can determine its meaning by looking to the language of the contract, the bargaining history, and any other relevant conduct that shows their understanding of the contract." 624 F.2d at 1185. Consistent

---

**15.** Petitioner Local 803 suggests that under our Internal Operating Procedures, where an inconsistency is found in a subsequent case, the prior opinion governs and the latter decision is a nullity. Because of our resolution of this case, we find it both unnecessary and inappropriate to consider the question whether a panel of this Court may select which opinion applies in the face of a clear inconsistency. As indicated, *infra,* we find no such clear inconsistency between this Court's opinions in *Delaware Coca-Cola* and *Pacemaker Yacht.*

**16.** Chapter 8 of this Circuit's Internal Operating Procedures provides in pertinent part:
  **C. Policy of Avoiding Intra-Circuit Conflict of Precedent.**
  It is the tradition of this court that reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court in banc consideration is required to overrule a published opinion of this court.

IOP 8(c).

**17.** Indeed, our own fidelity to the IOPs dictate this result. While the substantive issues raised by *Delaware Coca-Cola* and *Pacemaker Yacht* may well be ripe for consideration by this Circuit in banc, the parties make their invitations prematurely and to the inappropriate forum. IOP 8(B) provides:
  Rehearing in banc is not favored and ordinarily will not be ordered except
  (1) where consideration by the full court is necessary to secure or maintain uniformity of its decisions....
Thus, as a panel of this Court, it is our duty to harmonize our decisions where it is possible to do so. Consideration of alleged inconsistencies between published opinions and the determination whether to overrule an opinion of this Court is reserved for in banc review.

with that general approach, the *Delaware Coca-Cola* Court first looked to the language of the particular clause before it[18] and determined that *"[w]ithout evidence to the contrary*, it is proper to presume that the no-strike clause is not broader than the arbitration clause." *Id.* at 1187 (emphasis added).[19] Recognizing that in the field of labor relations it is necessary to go beyond mere interpretation of contractual language, *see* 624 F.2d at 1188, the Court then proceeded to examine other extrinsic evidence to determine whether a clear and unmistakable waiver had been made.

Similarly, in *Pacemaker Yacht*, this Court began with an assessment of the language of the no-strike provisions in the parties' agreement.[20] There we found that the language in Article X of the collective bargaining agreement did not implicate the *quid pro quo* rationale underlying the doctrine of coterminous interpretation; rather, under that clause "the no-strike pledge ... was given in exchange for the Company's no-lockout pledge." 663 F.2d at 458–59. Reading the contract as a whole, we concluded that "the no-strike clause in Article IX alone bars strikes over arbitrable disputes, [whereas] Article X must be construed to bar strikes over nonarbitrable disputes...." *Id.* at 459. Having determined that the collective bargaining agreement itself manifested an intent to waive the employees' right to strike over nonarbitrable issues, the *Pacemaker Yacht* Court, like the panel in *Delaware Coca-Cola*, also examined other extrinsic factors, including certain statements made by Union officials

and the state of the law at the time the contract was made, to determine whether a clear and unmistakable waiver was effected. 663 F.2d at 459.

■ The standard that emerges from reading *Delaware Coca-Cola* in light of *Pacemaker Yacht* is that the applicability of the coterminous interpretation doctrine is an independent, preliminary determination, separate and distinct from the ultimate question whether an express, broadly worded no-strike clause constitutes a clear and unmistakable waiver of employees' statutory rights. In either instance— where the doctrine of coterminous interpretation applies to raise the presumption that the no-strike clause is no broader than the arbitration clause, and where it does not apply—the Board should consider extrinsic evidence as an integral part of its determination of the parties' intent on the issue of waiver. *Accord Local 1395*, 797 F.2d 1027 (D.C.Cir.1986); *International Bhd. of Electrical Workers, Local 387 v. NLRB*, 788 F.2d 1412 (9th Cir.1986).

Reading *Delaware Coca-Cola* in conjunction with *Pacemaker Yacht* also resolves the second issue raised by the parties' arguments for overruling those decisions. The Board argues that "this Court's authority to develop labor law policy within its own sphere of primary jurisdiction does not require it to reject a different but equally reasonable policy developed by the Board in the course of exercising the Board's primary jurisdiction over alleged

---

**18.** *See supra* note 14.

**19.** *Delaware Coca-Cola* also cited as a "second source of support" for application of coterminous interpretation doctrine, the "helpful analogy" of *Mastro Plastics*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). We do not read the Court's secondary reliance on *Mastro Plastics* as establishing a rigid rule of law that prohibits a court from ever finding waiver in an express broadly worded no-strike provision. *See also supra* note 9 (explaining the scope of *Mastro Plastics*).

**20.** The collective bargaining agreement in *Pacemaker Yacht* contained two express no-strike clauses. The first clause—Article IX, GRIEVANCE PROCEDURES—provided that "there shall be no suspension or stoppage of work and

an earnest effort shall be made to settle such differences immediately or in the manner ... [dictated by the grievance procedures]." 663 F.2d at 458. In the second clause—Article X, NO STRIKES OR LOCKOUT—"the Company agree[d] that there ... [would] be no lockouts and the Union agree[d] that there w[ould] be no strikes, picketing, slow downs, deliberate curtailment of production, work stoppages of any kind or other interruption of the Company's operations." *Id.* Our decision in that case, however, that the coterminous interpretation doctrine did not apply, was based independently on our conclusion that "the Board erred as a matter of law in concluding that Article X did not bar the strike over the Fund's delinquency." *Id.*

violations of the Act." Brief for the National Labor Relations Board at 26. Under the Board's view, we owe the usual deference to the Board's newly articulated policy in *Indianapolis Power* if we find that that policy is reasonable.[21] Accordingly, the Board maintains that the applicability of *Delaware Coca-Cola* is limited to § 301 suits. We disagree. As noted by the D.C. Circuit in *Local 1395*, "[a] divergence of interpretive standards 'would inevitably exert a disruptive influence' on the voluntary collective bargaining process central to federal labor policy.... [Rather,] a uniform approach to the interpretation of labor agreements is necessary to a healthy system of voluntary collective bargaining." 797 F.2d at 1032. Indeed, the Board's approach would produce a dual system of law under which Board decisions could effectively undermine federal policy developed by the courts in § 301 proceedings. Moreover, this Court's consideration of *Delaware Coca-Cola* in *Pacemaker Yacht* clearly reflects our preference for uniformity in the standards governing the issue of waiver in unfair labor practice proceedings before the Board and in § 301 proceedings before the courts. Accordingly, we find no impediment to the consideration of *Delaware Coca-Cola* and *Pacemaker Yacht* in our assessment of the Board's application of its *Indianapolis Power* rule in the instant action. Thus, to the extent *Indianapolis Power* is consistent with our precedent, it will apply to these facts.

## B.

The final question then is whether under the law of this Circuit the particular no-strike agreement between Local 803 and Metropolitan Edison effectively waives the employees' right to honor stranger picket lines. The operative language in the parties' contract contains an agreement by the union that "there shall be no strikes or walkouts by the Brotherhood or its members," and an agreement by the company that "there shall be no lockouts of the Brotherhood or its members...." Jt.App. at 58. Unlike the clause examined in *Delaware Coca-Cola*, the no-strike pledge here is clearly in exchange for the Company's pledge not to lockout union members. *Accord Pacemaker Yacht*, 663 F.2d at 458–59. The coterminous interpretation doctrine therefore does not operate to limit the scope of the union's no-strike obligation only to arbitrable disputes. Indeed, the doctrine here has no application at all. That tool of contract interpretation is only useful where a no-strike clause is not readily amenable to an alternative construction. Here, however, the language of the no-strike clause clearly indicates that the union's promise was not simply given in exchange for the Company's pledge to arbitrate disputes arising under the contract.

This conclusion is buttressed by the physical separation of the no-strike provision from the arbitration clause. *See also United States Steel Corp. v. NLRB*, 711 F.2d 772, 777–78 (holding that "in cases where an arbitration clause and an express no-strike clause are closely interwoven, it may be reasonable to infer that the parties intended the two provisions to have the same scope," but where the no-strike clause is "functionally independent" of the arbitration clause no such inference arises). While we recognize that physical separation alone is not conclusive, *see Delaware Coca-Cola*, 624 F.2d at 1188, we find in the structure of this contract a strong indication that the parties did not intend the no-strike and arbitration clauses to be coextensive.[22] For example, as found by the Board, in addition to the expression in the

---

21. The Board cites this Court's decision in *Slaughter v. NLRB*, 794 F.2d 120 (3d Cir.1986), for the proposition that even where the reviewing court has specifically endorsed the policy the Board subsequently discards, "[a]n administrative agency is not disqualified from changing its mind." *NLRB v. Local 103, Iron Workers*, 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978), and when it does so the reviewing court may only consider whether the policy is reasonable and consistent with the purposes of the NLRA. *Slaughter* is inapposite to the instant appeal. In *Slaughter* there was no intervening articulation of federal policy by this Court pursuant to our primary jurisdiction under section 301 of the LMRA.

22. Notwithstanding the Board's concession at oral argument that the language of the no-strike clause in the instant case does not differ significantly from that at issue in *Delaware Coca-Cola*,

no-strike clause of "the desire of both parties to provide uninterrupted and continuous service to the public," Jt.App. at 58, "the contract contains other references to the need for ... [Metropolitan Edison] to provide continuous service to its customers." *Id.* at 140.[23] The parties' repeated expression of their mutual purposes to maintain service without interruption, in conjunction with the functional independence of Article XI, is thus consistent with the view that the no-strike clause encompasses all actions, including sympathy strikes, that would frustrate that purpose. In sum, we conclude that the no-strike clause is not limited by its own terms or by any other contractual language to arbitrable disputes. Indeed, a fair reading of the collective bargaining agreement as a whole establishes an intention to waive the employees' right to engage in sympathy strikes.

Contractual language evincing an intent to bar sympathy strikes does not end our inquiry, for "the words parties use in drafting contracts are only evidence of their intent; the words are not themselves the parties' intent."[24] *Local 1395*, 797 F.2d at 1036. Intervenor Metropolitan Edison maintains, however, that extrinsic evidence also demonstrates an intention by the parties to prohibit all strikes during the term of the agreement, including sympathy strikes. Specifically, in addition to express language that clearly exchanges the union's no-strike pledge for the Company's no-lockout pledge, the physical separation of that clause from the arbitration clause, and the repeated references in the collective bargaining agreement to the desire for continuity of services, Metropolitan Edison contends that (1) the prevailing case law at the time the no-strike clause was negotiated; and (2) past arbitration awards interpreting the no-strike clause and the parties' conduct thereafter, demonstrates an intent to waive the right to sympathy strike. We agree.

The record establishes that the no-strike clause of Article XI has appeared unchanged in all of the contracts between Metropolitan Edison and the union for at least twenty-five years, *see* Jt.App. at 2–3, and was not discussed during the previous three contract negotiations in 1978, 1980, and 1981. *See id.* at 140. Local 803 responds that, at the time this provision initially was adopted, "general contractual language was *not* deemed to waive rights guaranteed under the Act, including the right to refuse to cross a picket line." Brief for Petitioner at 22 (emphasis in original). We simply find that Local 803's contention is not sustainable; the authority cited in support thereof is inapposite.[25] Indeed, prior to the Board's decision in *Davis-McKee*, it appears that the courts, the Board and arbitrators consistently inter-

---

we conclude otherwise. The no-strike clause in *Delaware Coca-Cola* consisted of a unilateral promise by the union not to engage in any strike. *See supra* note 14. Thus, the court's conclusion in *Delaware Coca-Cola*, unlike the one reached in *Pacemaker Yacht* and by this Court today, that the no-strike obligation need not be explicitly conditioned on the arbitration clause for the coterminous interpretation doctrine to apply, was reasonable under the circumstances. In other words, in *Delaware Coca-Cola* there was no substantive basis upon which to distinguish dependent and independent no-strike provisions. Conversely, here, where, in addition to being functionally independent from the arbitration clause, the no-strike pledge is expressly made in exchange for the Company's no-lockout pledge, there is no reason to invoke the *quid pro quo* rationale to determine the scope of the union's obligation.

**23.** The Board found additional references to the need for continuity of services in Articles II, III, IV and V of the parties' collective bargaining agreement. *See* Jt.App. at 140–41.

**24.** Similar to the D.C.Circuit in *Local 1395*, we believe that "[t]he Board may not, in the guise of enforcing the 'plain meaning' of contractual language, erect an inflexible presumption on an issue turning on the parties' *actual* intent." 797 F.2d at 1036 (emphasis in original). Consequently, the plain meaning argument pressed by the Board in the instant appeal must be rejected. Extrinsic evidence—whether affirmative or negative in nature—must be considered in order to sustain a finding of a comprehensive waiver.

**25.** The decisions cited by Local 803, *see* Brief of Petitioner at 22, in support of its contention that the weight of authority at the time the no-strike language was adopted disfavored reading broad no-strike provisions to constitute waiver of the right to engage in sympathy strikes involve either waiver principles unrelated to the determination of the scope of a no-strike clause, *see, e.g.*, Timkin Roller Bearing Co., 138 N.L.R.B. 15 (1962)(grievance-arbitration agreement did not waive union's statutory right to acquire wage data); Hekman Furniture Co., 101 N.L.R.B. 631

preted broad no-strike provisions to waive the right of employees to engage in sympathy strikes.[26] *See, e.g., Rockaway News,* 345 U.S. at 79, 73 S.Ct. at 524 (newspaper deliveryman's refusal to cross picket line not guaranteed right under broad no-strike clause); *Local 12419, United Mine Workers (National Grinding Wheel Co.),* 176 N.L.R.B. 628 (1969) (discipline of union members for crossing picket line was proper since the right to honor a stranger picket line was barred by the broad no-strike provision in the parties' agreement); *Scranton-Spring Brook Water Serv.,* 29 Lab.Arb. 733 (BNA) (1958) (discharge of employee for honoring stranger picket line upheld since employee violated broad no-strike agreement); *Eastern Electric, Inc.,* 19 Lab.Arb. 741 (BNA) (1952) (limitation on union's duty to arbitrate unrelated to broad prohibition of all strikes, including sympathy strikes); *New England Master Textile Engravers Guild,* 9 Lab.Arb. 199 (BNA) (1947) (sympathetic work stoppage forbidden by broad no-strike clause). The union offers no contrary decisional authority on point.

Finally, we find probative two arbitration awards where the no-strike language in the parties' contract was interpreted as encompassing a prohibition against sympathy strikes. In 1973, Arbitrator Stanley Alderfer upheld disciplinary action against ten employees for refusal to cross a picket line. *See* Jt.App. at 85–94. Interpreting the same no-strike clause at issue here, the arbitrator found the actions of the employees "a clear violation of Article XI," *id.* at 93, and further noted that "[t]his provision is eminently clear and the Union does not claim that it is ambiguous." [27] *Id.* Indeed, the union there did not contend that the no-strike provision categorically excluded sympathy strikes, but only the that employees were entitled to honor picket lines where they reasonably believed crossing to be unsafe. We find persuasive the argument by Metropolitan Edison that "[i]f the state of the law at that time was as the Union now contends, it is incredible that the Union did not make this argument to Arbitrator Alderfer in defending its members ... refus[al] to cross stranger picket lines." Brief for Intervenor at 29.

The 1979 Award of Arbitrator S. Harry Galfand also interpreted Article XI as prohibiting sympathy strikes. *See* Jt.App. at 95–113. Arbitrator Galfand reached his conclusion "not only because Arbitrator Alderfer said so in 1973, and made it the accepted interpretation of the Contract, which, in that respect, ... remained unchanged through subsequent negotiations[, but also,] ... because Alderfer's interpre-

(1952)(same); Tidewater Assoc. Oil Co., 85 N.L.R.B. 1096 (1949)(ambiguous clause did not constitute a specific waiver of the right to bargain collectively with the union with respect to the company's pension plan); or waiver principles associated with no-strike provisions incorporated in, or implied by, an arbitration clause, and thus limited by the arbitration clause. *See, e.g.,* Kellogg Co., 189 N.L.R.B. 948 (1971), *enf'd,* 457 F.2d 519 (6th Cir.), *cert. denied,* 409 U.S. 805, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972) ("the no-strike prohibition ... clearly and unambiguously states that only strikes over grievable disputes were barred, ... therefore a strike ... in support of the economic demands of fellow employees would not fall within the clause's ban"); Hoffman Beverage Co., 163 N.L.R.B. 981 (1967) (scope of no-strike pledge expressly limited to arbitrable disputes; thus employees refusal to cross picket line not in conflict with implied no-strike obligation); Hearst Corp., 161 N.L.R.B. 1405 (1966), *aff'd sub nom News Union of Baltimore v. NLRB,* 393 F.2d 673 (D.C.Cir.1968) (no-strike pledge limited to arbitrable disputes by both language of agreement and extrinsic evidence). None of these cases support Local 803's contention that a broad, independent no-strike provision of the nature involved here was uniformly—if ever—deemed to authorize sympathy strikes at the time this contract was negotiated.

**26.** Considering a similar contention, the D.C. Circuit observed that "the Board's *Davis-McKee* decision represents something of a sport among the corpus of the law of collective bargaining agreements viewed as a whole." *Local 1395,* 797 F.2d at 1035.

**27.** In contravention of the standard endorsed by this Court today, the arbitrator held in 1973 that "[i]n the absence of a provision which specifically states that employees are not required to cross any picket line the no-strike clause must be upheld." Jt.App. at 28. The *propriety* of Arbitrator Alderfer's interpretation of Article XI, however, is not at issue. Rather, the award, and the parties' reactions to it, are relevant insofar as they offer insight into the parties' understanding of the terms of the contract, specifically, the scope of the no-strike clause.

tation was unquestionably correct." *Id.* at 105–06. In addition, Arbitrator Galfand observed that in a prior, similar incident, Metropolitan Edison had clearly articulated its view that sympathy strikes and refusals to cross picket lines were in violation of the union's no-strike pledge. The arbitrator stated that "it was fair and reasonable to assume that the Officers, who put their signatures on the contract which contained Article XI, and who undoubtedly knew how that Article had been interpreted in the past, would convey the Company-stated policy to their membership." Jt.App. at 107. He further noted that "[i]f the Union Officers believed ... that the policy was wrong, they could have used the grievance procedure to resolve the issue." *Id.* at 107 n. 5.

Following these decisions, the union did not seek to renegotiate the terms of the contract defining its members' no-strike obligation. Nevertheless, Local 803 urges this Court to disregard both the arbitration awards and the union's inaction thereafter in assessing the intent of the parties' with respect to the scope of the no-strike clause. First, Local 803 relies on the conclusion of the ALJ in the instant action that " '[t]he 1973 and 1979 arbitration awards cannot be viewed as extensions of the [operative] contract,' " *see* Brief for Petitioner at 34 (quoting Jt.App. at 124), because arbitration awards are binding on the parties only during the life of the contract. We agree with the conclusion of the ALJ. That the awards are not extensions of the parties' contract, however, does not deprive them of their evidentiary value in ascertaining the parties' intent. In *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the Supreme Court recognized the probative value of prior arbitration awards. Although the Court rejected the argument that past arbitration decisions, combined with union inaction thereafter, could independently constitute a clear and unmistakable waiver of a statutory right, it noted that

[a]n arbitration decision may be relevant to establishing waiver of this statutory right when the arbitrator has stated that the bargaining agreement itself clearly and unmistakably imposes an explicit duty on [the] union....

Even if the arbitration decisions do not state that there is a specific and explicit duty, they still may be relevant in determining the parties' intent.

*Id.* at 709 n. 13, 103 S.Ct. at 1477 n. 13. We read the awards of both arbitrators as interpreting the "bargaining agreement itself" as imposing on the union and its members the "specific duty" not to engage in sympathy strikes. It is irrelevant whether those interpretations were correct or adequately supported. What is relevant are the inferences reasonably drawn from this extrinsic evidence about the parties' understanding of the scope of Article XI. We emphasize that we do not find that the two arbitration awards "establish a pattern of decisions clear enough to convert the union's silence into binding waiver." *Id.* at 710, 103 S.Ct. at 1478. At a minimum, however, they are "relevant in determining the parties' intent." *Id.* at 709 n. 13, 103 S.Ct. at 1477 n. 13.

For similar reasons, we reject Local 803's straw man argument that, under *Spielberg Mfg. Co.*, 112 N.L.R.B. 1080 (1955), deferral to the 1973 and 1979 arbitration awards is improper.[28] Metropolitan Edison "do[es] not urge that the Board should have deferred to these awards during its investigation of the Union's unfair labor practice charge here. Rather, [they merely maintain that] these awards represent indicia of the parties' intent and are relevant in ascertaining whether the Union has waived its statutory right to engage in sympathy strikes." Brief for Intervenor at 33.

## CONCLUSION

In sum, we conclude that Article XI by its terms does not manifest an intent to

---

**28.** Under *Spielberg,* the Board will defer to an arbitrator's resolution of a dispute, without considering the facts which constitute the alleged unfair labor practice if:

▇ the proceedings appear to have been fair and regular,

▇ all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act.

112 N.L.R.B. at 1082.

exclude sympathy strikes from its coverage. While we recognize the desire of certain Metropolitan employees to engage in acts of solidarity with other unions, we find further that the extrinsic evidence demonstrates an intent to waive the employees' right to honor stranger picket lines. "When, ... [as here,] a no-strike clause is not limited by the arbitration clause, ... [a]ll that is required is that a comprehensive waiver extending beyond the arbitration clause be 'clear and unmistakable.'" *Pacemaker Yacht*, 663 F.2d at 458 (citations omitted). On this record, that standard has been met. Accordingly, for the foregoing reasons, the petition for review will be denied.